ADAM KARR (S.B. #212288)
akarr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2811
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

K. LEE BLALACK II (*pro hac vice*)
lblalack@omm.com
MEAGHAN VERGOW (*pro hac vice*)
mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
JENNIFER SOKOLER (*pro hac vice*)
jsokoler@omm.com
ANTON METLITSKY (*pro hac vice*)
ametlitsky@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant*
*The Regents of the University of California*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No. 2:26-cv-05589-CAS-AS

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

Judge: Hon. Christina A. Snyder
Courtroom: 8D
Hearing: January 25, 2027, 10:00 a.m.

# TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. UC and UCLA Respond to Antisemitism on Campus in the Wake of the October 7, 2023 Terrorist Attacks ........ 3

B. UCLA Successfully Enhances Its Capacity to Respond to Protests After the Spring 2024 Royce Quad Encampment ........ 4

C. UCLA's Ongoing Efforts to Combat Antisemitism ........ 5

D. Procedural History ........ 7

LEGAL STANDARD ........ 9

ARGUMENT ........ 9

I. The Federal Government Lacks Standing to Seek Injunctive Relief ........ 9

A. The Federal Government Fails to Allege Imminent Likelihood of Future Injury ........ 10

B. The Federal Government Does Not Allege Facts Clearly Demonstrating That UCLA Will "Cause" Future Injury Redressable Via Injunctive Relief ........ 11

II. The Federal Government Has Not Plausibly Alleged a Title VI "Deliberate Indifference" Claim ........ 12

III. The Federal Government's "Breach of Contract" Claim Fails as a Matter of Law ........ 15

A. The Federal Government's Contract Claim Conflicts with Title VI and the Spending Clause ........ 15

1. The Federal Government's Contract Claim Is Contrary to Title VI ........ 15

2. The Federal Government's Contract Claim Is Contrary to the Spending Clause ........ 18

B. The Federal Government Fails to Allege a Material Breach of the Contract ........ 19

C. The Sweeping Remedies Sought by the Federal Government Are Unavailable ........ 20

CONCLUSION ........ 22

## TABLE OF AUTHORITIES


Page

**CASES**

*Adams v. Bell*,
711 F.2d 161 (D.C. Cir. 1983) ....................16

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ....................16

*Am. Ass'n of Univ. Professors v. Trump*,
815 F. Supp. 3d 907 (N.D. Cal. 2025)....................2

*Americopters, LLC v. FAA*,
441 F.3d 726 (9th Cir. 2006)....................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................9

*Aspen Consulting, LLC v. Sec'y of Army*,
25 F.4th 1012 (Fed. Cir. 2022)....................19

*Barnes v. Gorman*,
536 U.S. 181 (2002) ....................18

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) ....................18

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979), *abrogation recognized by Medina v. Planned Parenthood of S. Atl.*, 606 U.S. 357 (2025)....................14

*City of Chicago v. Noem*,
2025 WL 3251222 (N.D. Ill. Nov. 21, 2025)....................20

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ....................10, 11

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................9, 10, 11

*Csutoras v. Paradise High Sch.*,
12 F.4th 960 (9th Cir. 2021)....................12

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ....................18, 19

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) ....................13

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................12

*Desert Palace, Inc. v. Loc. Joint Exec. Bd. of Las Vegas*,
679 F.2d 789 (9th Cir. 1982)....................18

*Funke v. Sorin Grp. USA, Inc.*,
147 F. Supp. 3d 1017 (C.D. Cal. 2015)....................9

*Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*,
463 U.S. 582 (1983) ....................16

*Karasek v. Regents of Univ. of Cal.*,
956 F.3d 1093 (9th Cir. 2020)....................12

*Kestenbaum v. President & Fellows of Harvard Coll.*,
743 F. Supp. 3d 297 (D. Mass. 2024)....................10, 13

*Khan v. Johnson*,
65 F. Supp. 3d 918 (C.D. Cal. 2014)....................9

*Lutz v. U.S. Postal Serv.*,
485 F.3d 1377 (Fed. Cir. 2007) ....................19

*Nelsen v. King County*,
895 F.2d 1248 (9th Cir. 1990)....................9

*Oliva v. United States*,
961 F.3d 1359 (Fed. Cir. 2020) ....................19

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ....................18

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*,
798 F. Supp. 3d 77 (D. Mass. 2025)....................2, 8

*Raines v. Byrd*,
521 U.S. 811 (1997) ....................9

*Salmon Spawning & Recovery All. v. Gutierrez*,
545 F.3d 1220 (9th Cir. 2008)....................12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................9

*Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025) ....................14

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
742 F. Supp. 3d 133 (D. Mass. 2024)....................12

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026)....................2

*United States v. City of San Diego*,
2026 WL 874337 (S.D. Cal. Mar. 30, 2026)....................19

*United States v. Florida*,
938 F.3d 1221 (11th Cir. 2019)....................17

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024)....................9

*United States v. Marion Cnty. Sch. Dist.*,
625 F.2d 607 (5th Cir. 1980)....................14, 17

*United States v. President & Fellows of Harvard Coll.*,
2026 WL 2343193 (D. Mass. Aug. 13, 2026), *appeal filed*, No. 26-1978 (1st Cir. Sept. 2, 2026) ....................passim

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003)....................9

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ....................20

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000)....................9

*Wright v. Serv. Emps. Int'l Union Loc. 503*,
48 F.4th 1112 (9th Cir. 2022)....................9

*Yakoby v. Trs. of Univ. of Pa.*,
2025 WL 1558522 (E.D. Pa. June 2, 2025) ....................14

**<u>STATUTES</u>**

42 U.S.C. § 2000d-1 ....................passim

**<u>REGULATIONS</u>**

10 C.F.R. § 1040.114(e) ....................16

2 C.F.R. § 200.208(c)(1) ....................16

2 C.F.R. § 200.208(e) ....................16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


2 C.F.R. § 200.339 .......... 21

2 C.F.R. § 200.339(a) .......... 16

2 C.F.R. § 200.339(f) .......... 16

28 C.F.R. § 42.108(c) .......... 16

28 C.F.R. § 42.108(d) .......... 17

28 C.F.R. § 50.3 .......... 14, 16, 17

28 C.F.R. § 50.3(a) .......... 17

45 C.F.R. § 80.8 .......... 17

45 C.F.R. § 80.8(c) .......... 16

**<u>OTHER AUTHORITIES</u>**

"*Effect*," Scholastic Dictionary of American English (2d ed. 1963) .......... 13

"*Effect*," Webster's New World Dictionary of the American Language (College Edition, 1962) .......... 13

110 Cong. Rec. 6544 (1964) .......... 16, 19

26 *Williston on Contracts* § 68.1 .......... 21, 22

Restatement (Third) of Restitution & Unjust Enrichment § 54 .......... 21, 22

Restatement (Third) of Restitution & Unjust Enrichment § 54(2) .......... 22

U.S. Dep't of Health & Hum. Servs., Grants Pol'y Statement § 2.5.4.3 (Oct. 2025) .......... 20

## INTRODUCTION

The University of California, Los Angeles ("UCLA" or the "University") is resolute in its condemnation of antisemitism, its commitment to the wellbeing of its community members, and its dedication to ensuring a safe learning and working environment. In the wake of October 7, 2023, UCLA—like many universities nationwide—confronted significant challenges. Over the three years since, however, UCLA has worked tirelessly to foster a safe, secure, and inclusive environment for all students. The federal government's Complaint ignores those substantial efforts—confirming that this lawsuit is not really about ensuring compliance with civil rights laws, but about weaponizing those laws to bring institutions of higher education to heel.

The Complaint asserts two claims: (i) a Title VI claim seeking forward-looking relief based on years-old conduct by third parties, and (ii) a novel contract claim, which seeks to rescind grants affecting over 2,000 research projects and to recover over $2 billion in disbursements. A district court recently dismissed materially identical claims against Harvard University. *See United States v. President & Fellows of Harvard Coll.* ("*U.S. v. Harvard*"), 2026 WL 2343193, at *1 (D. Mass. Aug. 13, 2026), *appeal filed*, No. 26-1978 (1st Cir. Sept. 2, 2026). Here, as there, the government's claims fail as a matter of law.

The government's Title VI claim suffers from two fatal defects. First, the federal government lacks standing because the Complaint fails to plausibly allege an imminent likelihood of future injury, or that UCLA would be the cause of any such injury. Rather, it centers almost entirely on events from the 2023–2024 academic year. Second, for similar reasons, the government fails to allege a present and continuing Title VI violation. As in the *U.S. v. Harvard* case, the Complaint lacks allegations demonstrating that UCLA has not taken appropriate steps to combat antisemitism on its campus.

The government's contract claim also fails, just as in *U.S. v. Harvard*. The

government theorizes that UCLA's response to past conduct occurring on its campus violated a "material" term in *all* of UCLA's federally funded grants, allegedly entitling the government to restitution of past grant payments. That unprecedented theory contravenes Title VI and the Constitution, fails to allege any "material" breach, and seeks a remedy that is unavailable under contract law.

This action, like many others brought against institutions of higher education, is cloaked in the language of fighting antisemitism, and UCLA shares that laudable goal. But as other courts have recognized, the federal government's "onslaught" against higher education is "more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism." *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.* ("*Harvard v. HHS*"), 798 F. Supp. 3d 77, 122 (D. Mass. 2025); *see Am. Ass'n of Univ. Professors v. Trump* ("*AAUP*"), 815 F. Supp. 3d 907, 945 (N.D. Cal. 2025) (relying on "unrebutted record" of impermissibly coercive attempts to "stamp out … 'woke,' 'left,' 'anti-American,' 'anti-Western,' and 'Marxist' speech"); *Thakur v. Trump*, 176 F.4th 1187, 1199–1204 (9th Cir. 2026). This Court should reject this latest attempt to leverage governmental power as a tool for political coercion. The Complaint should be dismissed in its entirety.

## BACKGROUND[1]

The Complaint attempts to allege "deliberate indifference" by focusing on years-old events while strategically omitting UCLA's extensive progress in combatting antisemitism. The materials properly before the Court tell the fuller story. The below background is drawn from the Complaint and the documents it incorporates, along with evidence relevant to the consideration of UCLA's Rule 12(b)(1) motion.

[1] Unless noted, all emphasis is added and all citations and quotations are omitted.

### A. UC and UCLA Respond to Antisemitism on Campus in the Wake of the October 7, 2023 Terrorist Attacks

On October 7, 2023, Hamas perpetrated horrific terrorist attacks on Israel. Compl. ¶ 11. UCLA's then-Chancellor, Gene Block, quickly denounced the "largest one-day killing of Jews since the end of the Holocaust" and encouraged victims of antisemitic harassment to contact UCLA's Civil Rights Office ("CRO"). Teleanu Decl. Exs. 1–3.[2]

The Complaint spotlights incidents on campus that occurred soon after October 2023 (many of which involved speech protected by the First Amendment and/or individuals who were not affiliated with the University). *See, e.g.*, Compl. ¶¶ 17, 14–24, 106–111. But UCLA was not complacent toward the charged atmosphere on campus. UCLA unequivocally condemned antisemitism. Teleanu Decl. Exs. 1, 3–5[3]; Hunt Decl. ¶ 8; *see also* Compl. ¶ 50. UCLA formed a Task Force to Combat Antisemitism and Anti-Israeli Bias (the "Task Force") to examine campus climate and recommend reforms, Compl. ¶ 68, and furnished counseling resources for affected community members, Hunt Decl. ¶¶ 10, 13–15. The UC system implemented a new Anti-Discrimination Policy ("A-D Policy"), and launched a Systemwide Office of Civil Rights to promote the A-D Policy's uniform implementation across campuses, Teleanu Decl. Exs. 6–7; Freedman Decl. ¶ 6, Ex. 3.[4]

---

[2] Teleanu Decl. Ex. 1 (Block, Reflections at the Close of a Difficult Week (Oct. 13, 2023)), *id.* Ex. 2 (Block, Maintaining a Safe Learning and Working Environment (Oct. 27, 2023)); *see also id.* Ex. 3 (Block, University Statements on Violent Attacks Abroad (Oct. 9, 2023)).

[3] Teleanu Decl. Ex. 1 (Block, Reflections at the Close of a Difficult Week (Oct. 13, 2023)); *id.* Ex. 3 (Block, University Statements on Violent Attacks Abroad (Oct. 9, 2023)); *id.* Ex. 4 (UCLA Newsroom, Resources to support safety (Oct. 27, 2023)); *id.* Ex. 5 (Block, Standing Against Bigotry (Nov. 10, 2023)).

[4] Teleanu Decl. Ex. 6 (Drake, President Drake announces new SOCR (Feb. 20, 2024)); *id.* Ex. 7 (UCOP, SOCR Website); Freedman Decl. Ex. 3 (UC A-D Policy

### B. UCLA Successfully Enhances Its Capacity to Respond to Protests After the Spring 2024 Royce Quad Encampment

On April 25, 2024, as part of a nationwide movement, pro-Palestinian protesters erected tents in Royce Quad, at the center of UCLA's campus. Compl. ¶ 24. Many encampment participants were not affiliated with UCLA. *Id.* ¶ 88. The Complaint describes UCLA's tiered, strategic response to the encampment: UCLA initially refrained from engaging law enforcement out of concern for the safety of students and "the need to support the free expression rights of our community," but ultimately increased security personnel, "instituted additional security measures," *id.* ¶¶ 30, 34, and shut down the encampment with the assistance of law enforcement, which made more than 200 arrests, *id.* ¶ 63.

Following the encampment, UCLA significantly enhanced its capacity to respond to future protests, including by creating a new Office of Campus and Community Safety ("OCCS"), *see* Lurie Decl. ¶ 5. It also strengthened its time, place, and manner ("TPM") policies. As a public university, UCLA must comply with the First Amendment, *see* Compl. ¶ 86, so it has developed content-neutral rules that govern when, where, and how speech and expressive conduct may occur on campus. UCLA's TPM policies prohibit unauthorized encampments, activities restricting free movement of individuals on campus, and evading identification when violating University policies or applicable laws. *See* Lurie Decl. ¶¶ 12–13, 18, Exs. 7–10; Teleanu Decl. Ex. 8.[5]

UCLA's efforts have been successful. Since the removal of the Royce Quad encampment, there has been no encampment—or anything like it—on UCLA's campus. Lurie Decl. ¶¶ 14, 20–22; Gorden Decl. ¶ 11. Indeed, UCLA intervened

---

(Jan. 1, 2026)).

[5] Lurie Decl. Ex. 7 (UCLA Policy 850); *id.* Ex. 8 (UCLA Policy 852); *id.* Ex. 9 (UCLA Policy 860); *id.* Ex. 10 (UCLA Policy 862); Teleanu Decl. Ex. 8 (UCLA, Bruin Post: Finalized TPM Policies (Sept. 19, 2025)).

swiftly to prevent attempts to set up encampments and occupation of campus buildings on three occasions in 2024. Compl. ¶¶ 62, 65–66. And when Students for Justice in Palestine ("SJP") and Graduate Students for Justice in Palestine ("GSJP") violated UCLA's TPM policies, UCLA revoked SJP's and GSJP's status as registered student organizations in 2025. Frenk Decl. ¶ 11.c; Gorden Decl. ¶ 7; Compl. ¶ 97.

The Complaint identifies a handful of additional protests in late 2024, 2025, and January 2026. *See* Compl. ¶¶ 91, 98, 131. But the Complaint does not allege that any of these events resulted in significant or sustained disruption to university classes or operations. And UCLA appropriately responded to these events. Lurie Decl. ¶¶ 14, 21 (cataloguing UCLA's responses); Gorden Decl. ¶ 10 (same). In short, UCLA has efficaciously managed protest events for more than two years.

### C. UCLA's Ongoing Efforts to Combat Antisemitism

For decades, UCLA has been home to a thriving Jewish and Israeli community. Hunt Decl. ¶¶ 4–7. An array of University-supported programs complements the University's civil rights infrastructure, which enforces the systemwide A-D Policy. Freedman Decl. ¶¶ 2, 6–9, 12–18. The Complaint mentions a handful of incidents that allegedly defied the A-D Policy. *See* Compl. ¶¶ 99–112 (alleging instances of "anti-Israel bias"). But the Complaint ignores UCLA's responses to those limited incidents and sidesteps the broader context of UCLA's recent reforms. *See, e.g.*, Lurie Decl. ¶¶ 4–22; Gorden Decl. ¶¶ 5–7, 10–13; Freedman Decl. ¶¶ 6–20; Frenk Decl. ¶¶ 9–12; Hunt Decl. ¶¶ 8–18.

Over the past few years, the University has dedicated significant resources to enhancing its capacity to respond to complaints of discrimination and harassment. In 2024, UCLA implemented new training programs for students, faculty, and staff focused on preventing national-origin-based discrimination and promoting compliance with the A-D Policy. Gorden Decl. ¶ 13; Freedman Decl. ¶¶ 7, 12.c, 13–16. That year, the University also voluntarily agreed to take specific actions to

address Title VI compliance concerns raised by the U.S. Department of Education relating to discrimination based on actual or perceived national origin. Freedman Decl. Ex. 2 (Voluntary Resolution Agreement ("VRA")).[6] The University has fulfilled its commitments under this VRA. Freedman Decl. ¶ 5.

In January 2025, Chancellor Julio Frenk assumed leadership of UCLA and made addressing antisemitism one of his highest priorities. Frenk Decl. ¶¶ 2, 6–11. Beginning in February 2025, Chancellor Frenk conducted meetings with 29 UCLA schools and units and more than 5,000 faculty, staff, students, and alumni. Frenk Decl. ¶ 11.a, Ex. 5 at 1.[7] That same month, Frenk appointed Steve Lurie—a 27-year Los Angeles Police Department veteran who was previously that department's liaison to Los Angeles's Jewish community—to head the OCCS. Frenk Decl. ¶ 11.b; Lurie Decl. ¶¶ 2–3. In March 2025, Chancellor Frenk announced UCLA's Initiative to Combat Antisemitism, which he tasked with implementing the Task Force's recommendations under the leadership of Task Force chair Professor Stuart Gabriel. Frenk Decl. Ex. 4[8]; Gabriel Decl. ¶ 6. The Initiative worked with administrators across the University to enhance antisemitism training, the discrimination reporting system, and enforcement of TPM policies. *See* Gabriel Decl. ¶¶ 7–8. UCLA also reorganized its Civil Rights Office in 2025 to streamline the process for reviewing complaints, hired a dedicated Title VI officer, and implemented other reforms, including in the specific schools highlighted in the Complaint. Freedman Decl. ¶¶ 10–17; *see* Hunt Decl. ¶¶ 11, 13–18.

In July 2025, UCLA also settled an antidiscrimination lawsuit[9] brought by

---

[6] Freedman Decl. Ex. 2 (VRA (Dec. 18, 2024)).

[7] Frenk Decl. Ex. 5 (Frenk, Reflection, Action and Our Path Forward (Apr. 28, 2025)).

[8] Frenk Decl. Ex. 4 (Frenk, Initiative to Combat Antisemitism (Mar. 10, 2025)).

[9] Compl., *Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702 (C.D. Cal. June 5, 2024), ECF No. 1; *see* Compl. ¶¶ 115–16 nn.149–50 (referencing *Frankel*).

three UCLA students relating to the Royce Quad encampment. While UCLA admitted no fault, the University agreed to a Consent Judgment prohibiting the exclusion of Jewish "students, faculty, and/or staff" from UCLA's ordinarily available programs, activities, and campus areas and agreed to make a significant monetary investment in organizations committed to combatting antisemitism on campus.[10] UCLA continues to comply with that Consent Judgment today.

Most recently, in May 2026, the Initiative published a comprehensive "Roadmap to Fight Discrimination," documenting the progress made to date and making further recommendations with concrete goals, timelines, and accountability measures. Gabriel Decl. ¶ 8, Ex. 2.[11] Chancellor Frenk immediately established working groups to implement the Roadmap's recommendations. Frenk Decl. ¶ 10; Gabriel Decl. ¶ 9.

UCLA's efforts have yielded measurable results. Earlier this year, the Anti-Defamation League released its Campus Antisemitism Report Card, which measures how institutions of higher education address antisemitism through policy and practice. Frenk Decl. ¶ 12. UCLA rose to a "B" in 2026, from an "F" in 2024. *Id.* UCLA's internal metrics similarly demonstrate improvements in its institutional capacity to respond to reports of discrimination, including faster average timelines between the receipt of reports to intake, assessment, and resolution. Freedman Decl. ¶ 19. Reflecting the efficacy of the University's actions, the Complaint alleges no recent incidents at UCLA. Compl. ¶ 98.

**D. Procedural History**

On May 9, 2025, the United States opened a Title VI investigation into UC. Compl. ¶ 8. In the publicly reported words of the former Department of Justice

---

[10] Consent Judgment at 3, *Frankel*, No. 2:24-cv-04702 (C.D. Cal. July 29, 2025), ECF No. 210 at 3; *see* Compl. ¶ 118 n.153.

[11] Gabriel Decl. Ex. 2 (UCLA Initiative to Combat Antisemitism Action Group Report (May 14, 2026)).

("DOJ") attorneys who worked on it, the investigation was a "political hit job" designed to "come up with a reason to be ready to sue UC."[12] Twelve weeks later, DOJ issued the predetermined conclusion that UCLA violated Title VI. *Id.* ¶ 9. The United States sent UCLA a laundry list of demands that would curtail academic freedom and cripple the University's capacity to pursue its educational mission, and sought a $1 billion payment.[13] Many of the demands had nothing to do with antisemitism, let alone Title VI.[14] Meanwhile, the government suspended $584 million in federal funding to UCLA grantees,[15]—an unlawful tactic that is subject to multiple overlapping injunctions. *See supra* at 2 (discussing *AAUP* and *Thakur* injunctions); *see also Harvard v. HHS*, 798 F. Supp. 3d at 136 (enjoining similar actions against Harvard).

UCLA has not acquiesced in the government's demands, and the federal government has escalated its attacks by pursuing affirmative litigation alongside retaliatory defundings. On February 24, 2026, the federal government sued UC under Title VII, claiming that UCLA employees were subjected to antisemitic discrimination. Compl. ¶ 112. The federal government filed this action on May 26. The Complaint's Title VI claim seeks injunctive relief for UCLA's alleged "deliberate indifference to a discriminatory hostile educational environment." *Id.* ¶¶ 132–39. The Complaint's contract claim seeks "[r]esci[ssion] … and restitution of all grant payments made to UCLA during the time of UCLA's noncompliance with Title VI" and an order releasing the government from its obligations to make

---

[12] Jaweed Kaleem, *Times Investigation: Ex-Trump DOJ Lawyers Say 'Fraudulent' UC Antisemitism Probes Led Them to Quit*, L.A. Times (Dec. 13, 2025), https://perma.cc/P272-628R.

[13] Message from President James B. Milliken to the UC Community (Sept. 15, 2025), https://perma.cc/8XYW-7HC4.

[14] *Id.*

[15] Statement from UC President James B. Milliken on UCLA Research Grant Suspensions (Aug. 6, 2025), https://perma.cc/Q2XQ-TQFB.

additional payments to UCLA grantees. *Id.* ¶¶ 140–45, 148(g)–(h).

## LEGAL STANDARD

Standing is jurisdictional and thus "properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). When considering a Rule 12(b)(1) motion, courts are "not restricted to the face of the pleadings, but may review evidence, such as declarations and testimony," relevant to "the existence of jurisdiction." *Khan v. Johnson*, 65 F. Supp. 3d 918, 923 (C.D. Cal. 2014); *accord Americopters, LLC v. FAA*, 441 F.3d 726, 732 n.4 (9th Cir. 2006).

Under Rule 12(b)(6), while the Court must accept all well-pleaded facts as true, it is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Funke v. Sorin Grp. USA, Inc.*, 147 F. Supp. 3d 1017, 1022 (C.D. Cal. 2015); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A "court may … consider … documents attached to the complaint [and] documents incorporated by reference in the complaint" at the pleadings stage. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## ARGUMENT

### I. The Federal Government Lacks Standing to Seek Injunctive Relief

To have standing to seek injunctive relief, a plaintiff must clearly allege facts demonstrating that it faces an "objectively reasonable likelihood" of future injury that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (same).[16] Past harm is "largely irrelevant" to that showing. *Nelsen v. King County*, 895 F.2d 1248, 1251 (9th Cir. 1990); *see U.S. v. Harvard*, 2026 WL 2343193, at *1

[16] These principles bind the United States, including where the government sues under a statute. *See United States v. King County*, 122 F.4th 740, 750–51 (9th Cir. 2024); *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

("isolated" and "episodic" allegations of past harm do not plausibly establish likely *future* harm). The government does not—and cannot—satisfy that exacting standard.

### A. The Federal Government Fails to Allege Imminent Likelihood of Future Injury

The Complaint fails to plead a "certainly impending" future injury, *Clapper*, 568 U.S. at 409–14, focusing overwhelmingly on incidents that occurred more than two years ago. The same defect recently led a district court to dismiss a similar claim that the government brought against Harvard University. *U.S. v. Harvard*, 2026 WL 2343193, at *1. Even though that judge, Judge Stearns, had found two years earlier that an "outburst of antisemitic behaviors" on Harvard's campus in 2023–2024 gave rise to a plausible Title VI "deliberate indifference" claim brought by students at that time, *see Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 303–05, 310 (D. Mass. 2024) (cited in *U.S. v. Harvard*, 2026 WL 2343193, at *1 n.1), he reasoned in *U.S. v. Harvard* that the government's "isolated," "episodic," and stale allegations did not support a "plausible inference that any institutionalized noncompliance with Title VI persists," 2026 WL 2343193, at *1. So too here—especially when the Complaint glaringly ignores UCLA's extensive efforts to combat antisemitism in recent years. *Supra* at 3–7.

Indeed, notwithstanding its omissions, the Complaint itself demonstrates that the University's operative policies for responding to antisemitism have been effective. For instance, while the Complaint refers to sporadic protests in the 2024 and 2025 academic years, *see, e.g.*, Compl. ¶¶ 91, 96, 98, 131, none remotely resembled the Royce Quad encampment, and in no instance did UCLA "effectively den[y] Jewish and Israeli students at UCLA equal access to the education institution's benefits, resources, and opportunities," *see id.* ¶ 138. UCLA's recent responses to disruptive protest activity have been effectual, not "indifferent." *See supra* at 5–7. Nor does the Complaint allege any violations of the Consent Judgment's protections, or any other facts demonstrating that future Title VI violations will occur.

The Complaint's allegations concerning purported shortcomings in UCLA's enforcement of its A-D Policy (*see* Compl. ¶¶ 99–112) are similarly deficient—like the rest of the Complaint, those allegations concern years-old events and overlook that UCLA has reorganized its CRO, streamlined its complaint intake process, hired a dedicated Title VI Officer and a new Assistant Vice Chancellor for Civil Rights, and refined its training programs. *See* Freedman Decl. ¶¶ 2, 10–19; Hunt Decl. ¶¶ 11, 16–18. Tellingly, none of the alleged incidents occurred after UCLA instituted these changes. Compl. ¶¶ 99–112. The Complaint also fails to mention that UCLA is in full compliance with the VRA, which specifically addresses complaints based on actual or perceived national origin.

Finally, the federal government points to the October 2024 report of UCLA's Task Force on Antisemitism as purported "evidence and analysis regarding the campus climate for Jewish and Israeli community members." *See* Compl. Ex. A at 1; Compl. ¶¶ 39, 56, 68–72, 75–76, 86–88, 94, 108, 117. But the Complaint again ignores that the Task Force was formed at UCLA's request and reflects the University's commitment to combatting antisemitism. The Task Force was "charged with identifying areas of concern and proposing solutions," Gabriel Decl. ¶ 5, and Chancellor Frenk has tasked the Initiative with implementing them. *See supra* at 6. That is action, not indifference.

The government's head-in-the-sand disregard for UCLA's recent reforms cannot satisfy its burden to demonstrate standing. The Complaint's allegations of future harm are speculative, and therefore insufficient. *See Clapper*, 568 U.S. at 409-14; *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983).

### B. The Federal Government Does Not Allege Facts Clearly Demonstrating That UCLA Will "Cause" Future Injury Redressable Via Injunctive Relief

The federal government also cannot obtain injunctive relief based on future injury caused by "the independent action of some third party not before the court." *See Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir.

2008). The overwhelming majority of the long-since-resolved incidents underlying the Complaint's Title VI claim were neither caused by UCLA nor sanctioned by UCLA policy. *See, e.g.*, Compl. ¶¶ 19, 22, 23–28, 46–48, 55, 66, 96, 98; *see also supra* at 4–5. Rather, they were caused by unidentified protesters and vandals, including non-members of the University community. *See, e.g.*, Compl. ¶¶ 20, 86, 88–89. The Supreme Court has consistently "refus[ed] to endorse standing theories that rest on speculation about the decisions of independent actors, particularly speculation about future unlawful conduct." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). The Complaint rests on exactly such speculation that unaffiliated third parties could someday deny students access to educational programs or activities and that *UCLA* would be the cause of any resulting injury. That fails to carry the government's burden, particularly given UCLA's extensive efforts to strengthen campus safety.

## II. The Federal Government Has Not Plausibly Alleged a Title VI "Deliberate Indifference" Claim

Count I alleges a "deliberate indifference" claim under Title VI and seeks injunctive and declaratory relief. Compl. ¶¶ 132–39, 147. Even assuming standing, this claim fails as a matter of law.

Title VI sets a "high bar," requiring a plaintiff to show the defendant engaged in *intentional discrimination* through deliberate indifference to third-party harassment. *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 966 (9th Cir. 2021). It is not enough to allege that a university's response was "negligent, lazy, or careless." *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020). Title VI does not demand a "faultless response," especially on a "campus embroiled" in conflict. *See StandWithUs Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 742 F. Supp. 3d 133, 142–43 (D. Mass. 2024). Rather, a plaintiff must show that a university's "'response to the harassment or lack thereof [was] clearly unreasonable in light of the known circumstances.'" *Karasek*, 956 F.3d at 1105 (quoting *Davis v. Monroe*

*Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)). Here, the Complaint focuses almost exclusively on UCLA's responses to the 2024 Royce Quad encampment. But as the Complaint itself acknowledges, UC swiftly denounced the violence, increased the security presence, and ultimately sought law-enforcement intervention. *See* Compl. ¶¶ 34, 50, 58, 63. The Complaint's factual allegations fail to demonstrate that UCLA was indifferent to third-party harassment of its Jewish and Israeli community members.

Even putting aside the insufficiency of the Complaint's *factual* allegations of deliberate indifference, there is a purely *legal* issue that requires dismissal for the same reason the nearly identical complaint in *U.S. v. Harvard* was dismissed: the government cannot bring a Title VI "deliberate indifference" claim for injunctive relief based solely on allegedly deficient responses to *past* discrimination or harassment. Rather, the Complaint must—and does not—plausibly allege *ongoing* violations.

Congress explicitly limited the federal government's role with respect to the enforcement of Title VI to ensuring that "[c]ompliance with" Title VI is "effected," 42 U.S.C. § 2000d-1; *see also infra* Part III.A.1. This prospective focus means that the federal government cannot state a plausible Title VI claim for *past* instances of "deliberate indifference" that are not *continuing*. *See U.S. v. Harvard*, 2026 WL 2343193, at *1.[17] As Judge Stearns held in *U.S. v. Harvard*, even if Harvard had violated Title VI in the past—and Judge Stearns himself found that the allegations in the complaint *did* state a past Title VI violation, *see id*. at *1 n.1 (citing *Kestenbaum*, 743 F. Supp. 3d at 303–05)—Harvard could not be held liable for prospective relief

---

[17] Contemporaneous dictionary definitions of "effect" confirm the statute's fundamentally prospective focus. *See* "*Effect*," Webster's New World Dictionary of the American Language (College Edition, 1962) ("to bring about; cause to happen; accomplish; produce as a result"); "*Effect*," Scholastic Dictionary of American English (2d ed. 1963) ("to cause; bring about; accomplish").

absent plausible allegations that it is violating Title VI *now*. The same logic applies here.

Limiting the federal government to forward-looking relief to prevent future "deliberate indifference" aligns with Congress's intent that Title VI's onerous remedies remain a "last resort." *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 705 & n.38 (1979), *abrogation recognized by Medina v. Planned Parenthood of S. Atl.*, 606 U.S. 357 (2025). Until the last few months, the federal government agreed. DOJ regulations, for instance, cabin "judicial enforcement" of Title VI to relief "designed to secure compliance," not to punish past shortcomings. 28 C.F.R. § 50.3 (contemplating suit only where agency heads "conclude there *is* noncompliance" with the statute). Indeed, published case law and the Department's own enforcement summaries confirm that, until its recent campaign against Harvard and UC, the federal government used Title VI only to address *ongoing* violations. *See United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 608 (5th Cir. 1980) (suit where "defendants have followed *and continue to follow* a policy of racial discrimination"); *see also* U.S. DOJ – C.R. Div., *Case Summaries*, https://www.justice.gov/crt/case-summaries (listing 8 "case summaries" related to Title VI enforcement, *all of which* concerned allegations of present violations).

The Complaint succumbs to these principles by failing to plausibly allege that deliberate indifference to antisemitism "persists … to this day" on UCLA's campus. *U.S. v. Harvard*, 2026 WL 2343193, at *1. Reforms that the Complaint itself acknowledges, *see, e.g.*, Compl. ¶¶ 68, 100, refute the conclusory claim that UCLA has "declined to take meaningful action to protect" Jewish and Israeli students. Compl. at 2; *see Stand With Us Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 22 (1st Cir. 2025) (citing MIT's Standing Together Against Hate initiative in dismissing deliberate indifference claim); *Yakoby v. Trs. of Univ. of Pa.*, 2025 WL 1558522, at *7 n.3 (E.D. Pa. June 2, 2025) (citing University of Pennsylvania's Presidential Commission on Countering Hate and Building Community in dismissing

deliberate indifference claim). What's more, the federal government's claim is flatly inconsistent with the *Frankel* Consent Judgment and UCLA's continuing compliance with the OCR VRA, both of which demonstrate UCLA's ongoing efforts to *prevent* discrimination. The Complaint therefore alleges no "plausible" claim for a *present* Title VI violation.

## III. The Federal Government's "Breach of Contract" Claim Fails as a Matter of Law

The Complaint's novel breach of contract claim fares no better. The government's theory is that UCLA's compliance with Title VI was a "material term of" each of its federal grants, and thus that UCLA's alleged past noncompliance allows the government to obtain rescission and restitution "of all grant payments made to UCLA during the time of UCLA's noncompliance," up to the present. Compl. ¶¶ 144–45, 148(f)–(h). This theory—which no court has ever upheld—fails for three reasons. First, it is at odds with both Title VI and the Spending Clause. Second, the Complaint does not plausibly allege a material breach of contract. And third, the federal government seeks extraordinary remedies that are unavailable under ordinary contract law principles.

### A. The Federal Government's Contract Claim Conflicts with Title VI and the Spending Clause

Through Title VI, Congress sought to ensure *prospective* compliance with anti-discrimination laws. *See supra* at 12–14; *U.S. v. Harvard*, 2026 WL 2343193, at *2. The federal government's contract claim—which seeks rescission and restitution of *all* grant funds paid over the last several years—conflicts with both the remedial scheme prescribed by Congress and the Spending Clause.

#### 1. The Federal Government's Contract Claim Is Contrary to Title VI

Title VI's "real objective" is "the elimination of discrimination in the use and receipt of Federal funds." *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463

U.S. 582, 601 (1983) (quoting 110 Cong. Rec. 6544, 6544 (1964) (Sen. Humphrey)). But Congress also recognized that "some funding terminations harm beneficiaries of programs funded as much as they harm fund recipients themselves." *Adams v. Bell*, 711 F.2d 161, 181 (D.C. Cir. 1983). Accordingly, Congress dictated that the "remedy of termination of assistance" should be "a last resort, to be used only if all else fails." *Guardians Ass'n*, 463 U.S. at 601. To achieve that objective, Congress enacted "a very elaborate scheme for implementing" funding terminations, *Adams*, 711 F.2d at 181, coupled with "elaborate restrictions on agency enforcement," *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), which explicitly limit the federal government's role to ensuring that "[c]ompliance with" Title VI is "effected," 42 U.S.C. § 2000d-1. *See U.S. v. Harvard*, 2026 WL 2343193, at *2 ("Congress's intent was not to penalize a wayward funding recipient but instead to incentivize it to bring itself into compliance with Title VI."). Thus, for instance, a funding termination must generally "be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." 42 U.S.C. § 2000d-1. And the federal government can take no action until the relevant agency "has determined that compliance cannot be secured by voluntary means." *Id.*[18]

To be sure, Congress also authorized the federal government to effect compliance "by any other means authorized by law." 42 U.S.C. § 2000d-1. But punitive disgorgement of *past* grant funding is fundamentally incompatible with the law. Title VI contemplates that, for *all* means of effectuating compliance, "the objective should be to secure prompt and full compliance *so that needed Federal assistance may commence or continue*," not to seek retrospective retribution for

[18] Regulations implementing Title VI confirm this measured approach. *See, e.g.*, 28 C.F.R. § 50.3 (cabining "judicial enforcement" of Title VI to relief "designed to secure compliance"); 2 C.F.R. §§ 200.339(a), (f); *id.* § 200.208(c)(1) (similar); *id.* § 200.208(e); 10 C.F.R. § 1040.114(e) (DOE) (limiting effect of defunding to specific program or part of program in which noncompliance is found); 45 C.F.R. § 80.8(c) (HHS) (same); 28 C.F.R. § 42.108(c) (DOJ) (same).

alleged past noncompliance. 28 C.F.R. § 50.3(a); *see, e.g.*, 45 C.F.R. § 80.8 (allowing enforcement by "other means" to "effect compliance"); 28 C.F.R. § 42.108(d) (same). Thus, DOJ's guidance contemplates Title VI enforcement through "a suit to obtain specific enforcement" of nondiscrimination assurances or other court action "designed to secure compliance" prospectively. 28 C.F.R. § 50.3; *see Marion Cnty.*, 625 F.2d at 609 (seeking specific performance); *United States v. Florida*, 938 F.3d 1221, 1225 (11th Cir. 2019) (seeking injunctive relief). That relief accords with Title VI's objective of eliminating discrimination while minimizing collateral damage to the ultimate beneficiaries of federal dollars.

The federal government's contract claim here attempts an end run around Congress's reticulated scheme. The Complaint seeks an across-the-board clawback of funds already paid and expended, for work that UCLA students, faculty, and researchers have already completed, without any attempt to limit that clawback to any particular programs or projects in which federal funds were allegedly affected by unlawful discrimination. Compl. ¶¶ 145, 148(g), (h). Further, the federal government's demand reaches into the now-distant past—long before DOJ's July 29, 2025, initial "finding" of Title VI noncompliance, *see id.* ¶ 125, and before its purported conclusion (in filing this action) that UCLA's compliance could not be obtained voluntarily, *id.* ¶ 127.

The grants the government identifies incorporate the requirements of Title VI, and thus its remedial scheme. *See, e.g.*, Compl. Ex. C at 8. They cannot support a breach-of-contract theory that defies that remedial scheme. The federal government is seeking through a common-law contract action precisely the kind of disproportionate, punitive enforcement that Congress deliberately foreclosed in Title VI, which mandates that any enforcement action must be "consistent with [the] achievement of the objectives of the statute authorizing the financial assistance." 42 U.S.C. § 2000d-1; *see U.S. v. Harvard*, 2026 WL 2343193, at *1. The government's blunderbuss theory is directly at odds with the careful scheme Congress chose. *See*

*Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (federal grants "originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy"). It fails as a matter of law.

**2. The Federal Government's Contract Claim Is Contrary to the Spending Clause**

The Spending Clause independently bars the government's contract claim. When acting pursuant to its Spending Clause authority, Congress may impose conditions on the disbursement of federal grant moneys only if it does so "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022); *Barnes v. Gorman*, 536 U.S. 181, 186–88 (2002). Title VI is a Spending Clause statute and, as such, permits remedies only to the extent that "the funding recipient is on notice that, by accepting federal funding, it exposes itself to liability of that nature." *Cummings*, 596 U.S. at 220 (emphasis omitted).

The Supreme Court has thus tightly constrained the remedies available under Spending Clause statutes. Although a funding recipient is generally on notice that "it will be subject to the usual contract remedies," it lacks notice of its exposure to "unusual, even 'rare' remedies." *Id.* at 221–23 (emphasis omitted). Atypical contractual remedies such as punitive damages, *see Barnes*, 536 U.S. at 188, or emotional distress damages, *Cummings*, 596 U.S. at 216, are thus unavailable, *id.* at 220. "Ordinarily, an award that exceeds the monetary loss which an injured party suffered as a result of a contract breach is considered punitive." *Desert Palace, Inc. v. Loc. Joint Exec. Bd. of Las Vegas*, 679 F.2d 789, 794 (9th Cir. 1982).

The Complaint's contract theory transgresses these fundamental constitutional limitations. The government does not seek the benefit of its bargain, but rather widescale rescission and a billion-dollar-plus refund of every federal dollar paid to the entire UCLA campus over the course of several years. That remedy bears no connection to the harm caused by any alleged discrimination suffered by individual

UCLA community members, nor is it tailored only to programs or projects in which discrimination is alleged to have occurred. Title VI disavows "'shotgun' authority to cut off all Federal aid." 110 Cong. Rec. at 6544. No "prospective funding recipient" would be "aware that it [c]ould face such liability," *Cummings*, 596 U.S. at 220, particularly when the unprecedented and draconian contract remedy sought by the federal government is directly inconsistent with the purpose and procedural protections of Title VI itself. *See supra* at 12–14, 16–18. The Court should reject it.

### B. The Federal Government Fails to Allege a Material Breach of the Contract

The breach claim rests on the contention that the federal government can retroactively declare that the general mandate of Title VI compliance was a "material" provision of UCLA's grants. In reality, the federal government's failure to plausibly allege a "material" breach of any contract provision is an independent reason why this claim fails.

To prevail on a breach of contract claim, a plaintiff must demonstrate "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) breach of that duty, and (4) damages caused by the breach." *United States v. City of San Diego*, 2026 WL 874337, at *3 (S.D. Cal. Mar. 30, 2026) (quoting *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020)). Breach requires a showing of "material noncompliance" with the terms of the agreement. *Aspen Consulting, LLC v. Sec'y of Army*, 25 F.4th 1012, 1016 (Fed. Cir. 2022); *see Lutz v. U.S. Postal Serv.*, 485 F.3d 1377, 1381 (Fed. Cir. 2007) ("A breach is material when it relates to a matter of vital importance, or goes to the essence of the contract."); *see also* Compl. ¶¶ 142, 144 (alleging "material" breach).

In the related context of False Claims Act suits, the Supreme Court has stressed that a government contractor's false representation of compliance with a statutory, regulatory, or contractual condition of payment is *not* necessarily "material" to the government's payment decision. *Universal Health Servs., Inc. v. United States ex*

*rel. Escobar*, 579 U.S. 176, 194 (2016). For instance, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated," that is "strong evidence that the requirements are not material." *Id.* at 195.

It is apparent from the Complaint itself that the protests and institutional responses underlying the government's purported breach of contract claim were widely and continuously publicized beginning in the fall of 2023. *See* Compl. Ex. A. Yet the federal government continued to pay UCLA grants without interruption for years. That demonstrates that any purported breach of grant terms premised on those allegations was *not* material. *Escobar*, 579 U.S. at 195. The government's post-hoc interpretation of grant language does not change that conclusion: UCLA should not be held liable for breach of an agreement based on a one-sided, after-the-fact construction of it.[19]

### C. The Sweeping Remedies Sought by the Federal Government Are Unavailable

Last, even if the Complaint pleaded a viable contract theory, the relief sought here—rescission and restitution of *all* grant payments made since October 2023—is unavailable as a matter of ordinary contract law.

The "normal redress for breach of contract is to give the injured party such

---

[19] The government has expressly acknowledged the novelty of this interpretation. For example, HHS modified its Grants Policy Statement in October 2025 to add language providing that the "General Certifications and Representations" of compliance with civil rights laws were considered "material." U.S. Dep't of Health & Hum. Servs., Grants Pol'y Statement § 2.5.4.3 (Oct. 2025), https://perma.cc/M3FZ-2N2Z. But what matters is the parties' understanding at the time of contracting, and "materiality" determinations do not turn on the "label the Government attaches to a requirement." *Escobar*, 579 U.S. at 181; *cf. City of Chicago v. Noem*, 2025 WL 3251222, at *6 (N.D. Ill. Nov. 21, 2025) (pre-2025 DHS grant conditions "did not extract a promise—under express threat of False Claims Act liability—that a grant recipient complied with all anti-discrimination laws on the books, whether related to funding or not").

relief as will put that party in as good a position as if the contract had been performed." 26 *Williston on Contracts* § 68.1. Claims for compensatory damages, measured by the "value of the performance promised by the other party," are therefore the norm, *id.*, and restitution and rescission are atypical remedies reserved for special circumstances absent here.[20] In particular, the federal government's claims arise from a *valid grant* (and thus are not "quasi-contractual," as restitution requires) and concern *services performed* for the duration of the relevant grants (which cannot be rescinded). *See* Restatement (Third) of Restitution & Unjust Enrichment § 54 ("[R]escission as an alternative remedy for breach of contract is not a means to recover the value of a performance that by its nature is impossible to restore, such as services[.]"). Rescission and restitution therefore are unavailable under ordinary contract law principles.[21]

Moreover, the federal government seeks far more than either remedy could ever support. Both doctrines limit recoveries to what's necessary to compensate the aggrieved party. Rescission "requires a mutual restoration and accounting in which each party (1) restores property received from the other, to the extent such restoration is feasible, (2) accounts for additional benefits obtained at the expense of the other … as necessary to prevent unjust enrichment, and (3) compensates the other for loss

[20] Restitution most commonly arises when parties have failed to form an express contract, but where the payment of "quasi-contractual" restitution would be proper to prevent "unjust enrichment." 26 *Williston on Contracts* § 68.1 The doctrine of "rescission" most commonly arises in contexts (such as real property transactions) where reversing the transaction and returning the parties to the positions they were in before contract formation would be justified. *Id.*

[21] The federal government's demand for a prospective bar on future payments is even further afield. *See* Compl. ¶ 148(i). That is not a contract remedy at all. It is an administrative sanction governed by Title VI—and subject to Title VI's procedures for imposing such sanctions, including agency-specific determinations, notice, opportunities for voluntary compliance, and program-specific action. *See* 42 U.S.C. § 2000d-1; 2 C.F.R. § 200.339; *supra* at 16.

from related expenditure as justice may require." 26 *Williston on Contracts* § 68.1; *accord* Restatement (Third) of Restitution & Unjust Enrichment § 54(2). Likewise, in restitution, "equitable considerations" "influence the determination of whether recovery is warranted in a given case," and recoveries are meant only to prevent unjust enrichment. 26 *Williston on Contracts* § 68.1.

Here, the federal government's claimed relief—complete reimbursement of all federal grants awarded since October 2023—would have the effect of unjustly enriching the *government*, not redressing any purported unjust enrichment by UCLA. The Complaint does not allege that UCLA grant recipients failed to perform the research or services that those grants funded. It alleges statutory violations wholly unrelated to those services. "Rescission is not forfeiture," and it "does not permit the claimant to recover what has been given without restoring what has been received." Restatement (Third) of Restitution and Unjust Enrichment § 54. The federal government is seeking forfeiture, and contract law does not permit it.

## CONCLUSION

The Court should dismiss the Complaint in full, with prejudice, and without leave to amend.

Respectfully submitted,

Dated: September 30, 2026

By: */s/ Adam Karr*

ADAM KARR (S.B. #212288)
akarr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2811
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

K. LEE BLALACK II (*pro hac vice*)
lblalack@omm.com
MEAGHAN VERGOW (*pro hac vice*)
mvergow@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

NATASHA W. TELEANU (*pro hac vice*)
nteleanu@omm.com
JENNIFER SOKOLER (*pro hac vice*)
jsokoler@omm.com
ANTON METLITSKY (*pro hac vice*)
ametlitsky@omm.com
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, New York 10019
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant The Regents of The University of California*

**CERTIFICATE OF COMPLIANCE WITH THE WORD COUNT**

The undersigned, counsel of record for Defendant, certifies that this brief contains 6,998 words, which complies with the word limit of L.R. 11-6.1.

Dated: September 30, 2026

Respectfully submitted,

By: */s/ Adam Karr*

Adam Karr
*Attorney for Defendant*