HARMEET K. DHILLON
Assistant Attorney General
JEFFREY MORRISON (MO 44401)
jeffrey.morrison@usdoj.gov
Deputy Assistant Attorney General
JOHN MERTENS (SBN 252762)
john.mertens@usdoj.gov
DANIEL S. FLICKINGER (AL No. 9539N77F)
daniel.flickinger@usdoj.gov
JOSHUA R. ZUCKERMAN (DC No. 1724555)
joshua.zuckerman@usdoj.gov
Attorneys
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 702-8186

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JULIE A. HAMILL (SBN 272742)
julie.hamill@usdoj.gov
AARON KOLLITZ (SBN 238580)
aaron.kollitz@usdoj.gov
Assistant United States Attorney
300 North Los Angeles Street, Suite 7516
Los Angeles, CA 90012
(213) 894-2464

*Attorneys for Plaintiff United States of America*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA

*Plaintiff*,

v.

REGENTS OF THE UNIVERSITY OF CALIFORNIA,

*Defendant*.

Case No. 2:26-cv-05589-CAS-AS

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

On April 25, 2024, following months of antisemitic and anti-Israeli demonstrations, masked and armed agitators, many of whom were openly hostile to Jews and Israelis, occupied the heart of the University of California, Los Angeles ("UCLA") campus. They built an illegal encampment, surrounded it with barriers, and formed "human phalanxes" to block Jews and Israelis from entering academic buildings.[1] They kicked and slapped Jews, beat Jews with sticks, and assaulted Jews with pepper spray.[2] One Jewish student was knocked unconscious and was taken to the hospital with an open head wound.[3]

Although UCLA knew that its Jewish and Israeli students risked physical assault when attempting to go to class or the library, UCLA inexplicably *took no serious action whatsoever* until May 2, 2024, when it finally allowed police to clear the encampment. Chaos ensued. Law-enforcement officers "were met with bursts of pepper spray, protesters wielding fire extinguishers against them, bright strobe lights, and protesters wearing helmets and goggles."[4]

UCLA's own Task Force to Combat Antisemitism and Anti-Israeli Bias ("Task Force"), published a damning report (Ex. 1) concluding that UCLA's "leadership allowed the encampment and related denial of campus access to continue" and "officials continued to refuse to break up the encampment even after the protesters denied Jews and others free passage and access to campus classrooms and facilities."[5] UCLA's leadership apparently preferred a do-nothing "de-escalation strategy" to protecting their Jewish and Israeli students from an angry mob organized by peers armed with tasers, lumber, and a sword.[6]

---

[1] The Task Force to Combat Antisemitism and Anti-Israeli Bias at UCLA, *Antisemitism and Anti-Israeli Bias at UCLA*, 53 (2024), attached as Ex. 1.

[2] *Id.* at 35; 57-58.

[3] *Id.* at 58.

[4] *Id.* at 59.

[5] *Id.* at 60.

[6] *Id.* at 58, 60.

This Court already has found that UCLA's non-response to the horror inflicted on Jewish and Israeli students was "unimaginable" and "abhorrent."[7] It correctly held that UCLA likely violated the First Amendment's Free Exercise Clause by excluding Jews from campus buildings, thoroughfares, and resources.[8]

UCLA's decision to ignore the harassment of, and discrimination against, Jewish and Israeli students also violates Title VI of the Civil Rights Act of 1964, which prohibits race and national-origin discrimination in higher education.[9] UCLA's top administrators knew that armed demonstrators beat up Jews and physically prevented Jewish and Israeli students from attending class. The Office of Equity, Diversity & Inclusion ("EDI office") received over one hundred complaints about antisemitism and anti-Israeli hostility but routinely ignored these complaints. In short, UCLA was deliberately indifferent to the suffering of its Jewish and Israeli students and declined to take meaningful action to protect them. Its behavior exemplifies the deliberate indifference towards discrimination that Title VI prohibits.

UCLA's failure to protect its Jewish and Israeli students remains ongoing. Despite purportedly implementing changes to its time, place, manner, and conduct codes, UCLA has, in fact, relaxed some of these rules with respect to ongoing campus demonstrations that target Jewish and Israeli students for harassment. More importantly, UCLA's pattern and practice of not enforcing, or else delaying enforcement of, its rules with respect to conduct that menaces Jewish and Israeli students remains in place. As recently as October 7, 2026—the third anniversary of the deadliest attack upon Jews since the Holocaust—members of UCLA's chapter of Students for Justice in Palestine wielded bullhorns and marched through campus chanting "[t]here is only one solution, Intifada revolution[,]" while deploying menacing human shields donned in masks to block the paths of Jewish

---

[7] *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1020 (C.D. Cal. 2024).

[8] *Id.* at 1026.

[9] 42 U.S.C. § 2000d.

and Israeli students and community members throughout campus common areas.[10] Despite this demonstration violating numerous UCLA time, place, manner, and conduct policies, officials looking on did not intervene.

The United States brings this action to compel UCLA to comply with Title VI, to recover the taxpayer subsidies the United States awarded to this discriminatory institution, and to require UCLA to reform its procedures to ensure that its time, place, manner, and conduct codes are uniformly enforced, and that all complaints of discrimination against and harassment of Jewish and Israeli students are properly investigated and addressed.

## PARTIES

1. Plaintiff is the United States of America (the "United States"). Combating antisemitism in American schools, colleges, and universities is, and has long been, a top priority of the United States.[11] As such, the United States Department of Justice ("Department") is coordinating investigations, lawsuits, and settlements related to allegations of unlawful antisemitism across numerous schools, colleges, and universities, in addition to the present case.[12]

2. Defendant Regents of the University of California is a state agency that operates the ten state universities within the University of California System. Under Article IX, § 9 of the California Constitution, Defendant has the "full powers of

---

[10] https://perma.cc/2RJ9-A7X4.

[11] *See* Exec. Order No. 13899, 84 F.R. 68779 (Dec. 11, 2019); Exec. Order No. 14188, 90 F.R. 8847 (Jan. 29, 2025).

[12] The following list is a subset of the Department's publicly announced antisemitism investigations, settlements, and lawsuits: Columbia University (https://perma.cc/RR2Q-8GRP); Northwestern University (https://perma.cc/8WU3-25WX); Harvard University (https://perma.cc/X9MQ-D4RM); George Mason University (https://perma.cc/TE53-P5QS); University of Virginia (https://perma.cc/8HDH-JSFF); Lincoln Memorial University (https://perma.cc/2LKR-BSLP); Concord-Carlisle, Massachusetts School District (https://perma.cc/2RFX-5TLG); University of North Carolina (https://perma.cc/26D6-WSMY).

organization and government" over the System, including UCLA. Cal. Const. art. IX, § 9(a). Defendants' principal place of operation is Oakland, California.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

4. This Court has the authority to enter a declaratory judgment and to provide injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b). UCLA is located in the Central District of California, and a substantial portion of the events and omissions giving rise to the United States' claims occurred in this district.

6. Title VI states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[13] If the Attorney General of the United States determines that compliance with Title VI by a recipient of federal financial assistance cannot be secured by voluntary means, the United States is authorized to compel compliance through judicial enforcement.[14]

7. UCLA is a recipient of federal financial assistance from several federal agencies, including the Department of Justice.

8. On May 9, 2025, the United States provided Defendant with written notice that the Department of Justice had opened an investigation into the UC System's response to incidents of antisemitic discrimination, harassment, abuse, and retaliation against students that occurred within the educational environment of the UC System, including UCLA, under Title VI.

---

[13] 42 U.S.C. § 2000d.

[14] 42 U.S.C. § 2000d-1; *see also* 28 C.F.R. § 42.108(a)-(d).

9. On July 29, 2025, the Department of Justice provided Defendant with written notice (Ex. 2) of its investigatory finding that UCLA's response to incidents of antisemitic discrimination, harassment, abuse, and retaliation against University students violated its legal obligations under Title VI.[15]

10. After providing Defendant with written notice of its findings, the Department of Justice met and conferred with UCLA to attempt to secure UCLA's compliance with Title VI by voluntary means. The Department of Justice has determined that Defendant's compliance with Title VI cannot be secured by voluntary means.

## STATEMENT OF FACTS

### A. Jewish and Israeli Students Were the Victims of Systemic Discrimination and Violence at UCLA.

11. On October 7, 2023, the designated foreign terrorist organization Hamas invaded the State of Israel and massacred approximately 1,200 people, including 46 Americans. Hamas took 254 hostages, including twelve Americans.[16] Most of Hamas's victims were unarmed civilians. Hamas terrorists raped both men and women and cut open a woman's womb and stabbed her unborn baby. Some victims were decapitated.[17] The October 7 terrorist attacks were the deadliest day for the Jewish people since the Holocaust.

12. The October 7 terrorist attack triggered a wave of antisemitism and anti-Israeli sentiment across American college campuses, including at UCLA.

13. Although elected officials across the United States and the world strongly condemned Hamas' October 7 attack, many students and faculty at UCLA celebrated it.

---

[15] 28 C.F.R. § 42.108(d); *see* Letter from Assistant Attorney General Harmeet K. Dhillon to Michael V. Drake (July 29, 2025), https://perma.cc/9TXD-N5TK (Ex. 2).

[16] Secretary of State Marco Rubio, *Two-Year Anniversary of October 7th Attack* (Oct. 7, 2025), https://perma.cc/M5JM-FVZU.

[17] Lucy Williamson, *Israel Gaza: Hamas raped and mutilated women on 7 October, BBC hears*, BBC (Dec. 5, 2023), https://perma.cc/Q5GL-XRLF.

14. On October 9, 2023, the Undergraduate Student Association Council Cultural Affairs Commissioner issued an official statement: "Thus, we honor the Palestinians on the frontlines taking their land and sovereignty back! From the River to The Sea, Palestine Will Be Free."[18]

15. On October 16, 2023, the University of California Ethnic Studies Faculty Council, which represents faculty at UCLA and across the University of California system, demanded that leadership "uplift the Palestinian freedom struggle[.]"[19]

16. Some protestors at UCLA "blamed Israel for the October 7, 2023, attacks or suggested that the attacks, rapes, and mass murders did not happen."[20]

17. On October 12, 2023, only five days after the October 7 attack, National Students for Justice in Palestine ("SJP") called for a nationwide "Day of Resistance."[21] At that time, the UCLA chapter of SJP ("SJPatUCLA") was a registered student organization. Hundreds of protesters used amplified sound, disrupting the educational environment in violation of UCLA rules, and wore masks and face coverings to intimidate Jewish students and to conceal their identities, also in violation of UCLA rules.[22]

18. On November 8, 2023, UCLA Divest and UCLA's SJP organized a rally inside Bunche Hall, disrupting classes and research. At one point, while marchers were beating a piñata of Israeli Prime Minister Benjamin Netanyahu, at least one demonstrator chanted "beat the f***king Jew!"[23]

---

[18] Ex. 1 at 47.

[19] UC Ethnic Studies Faculty Council, *Statement on bias in UC statements* (Oct. 16, 2023), https://perma.cc/KKL9-H8S5.

[20] Ex. 1 at 48.

[21] National SJP (@nationalsjp), Instagram (Oct. 12, 2023), https://perma.cc/ES3G-ZZKE.

[22] Aaron Bandler, *Roundup of SJP Chapters "'Day of Resistance' Protests,"* Jewish Journal (Oct. 18, 2023), https://perma.cc/T8FN-K8SL; UCLA Policy 850 § IV(A)(4) & (19), https://perma.cc/D6NH-3CYF.

[23] Ex. 1 at 49.

19. In October and November 2023, masked protesters, including some reportedly wielding large knives, tore down posters of Israeli hostages that had been placed on campus bulletin boards with appropriate permissions.[24]




20. Indeed, antisemitic students (and often faculty) at UCLA participated in marches and rallies that "almost always took place without a permit and … violated University and campus time, place, and manner rules."[25] The "marches usually featured" chants such as "kill the Jews" and "Intifada."[26] "During many of these marches and rallies, University affiliates and non-affiliates wore masks, often fashioned as keffiyehs covering

---

[24] *Id.* at 35, 64.

[25] *Id.* at 45.

[26] *Id.* at 46. The word "intifada" refers to Palestinian acts of terrorism against Jews and Israel and is often interpreted as endorsing violence against Jews and Jewish institutions. *See, e.g.*, American Jewish Committee, *What Does "Globalize the Intifada" Mean and How Can it Lead to Targeting Jews with Violence?* (Dec. 18, 2025), https://perma.cc/V6NM-C9RF.

their faces or surgical masks, with the intent of hiding their identities in violation of University and campus rules."[27]

21. According to a Jewish professor, in the fall of 2023, hundreds of people at one protest chanted "Itbah El Yahud" (Arabic for "slaughter the Jews").[28]

22. During the 2023 to 2024 academic year, signs, graffiti, and chants with antisemitic messages such as "die you fucking Jew" and "FUCK ALL Jews" as well as multiple displays of Nazi swastikas were found throughout UCLA's campus, including one swastika carved into a tree.[29] Demonstrators drew a Jewish star, the national symbol of Israel that features on its flag, on the ground with the words "STEP HERE" written on it.[30]

23. During the winter quarter in 2024, students constructed a statue "of a pig featuring a clock with the words 'Time is Running Out,' a bag with a dollar sign, a Jewish star, and flames around the words 'UC Regents.'" Although the sculpture blocked a sidewalk in violation of UCLA's time, place, and manner rules, UCLA took no action.[31]

---

[27] Ex. 1 at 50.

[28] Inna Faliks, *UCLA Response to Antisemitism Hits a Sour Note*, Jewish Journal (Nov. 22, 2023), https://perma.cc/58GQ-CWAJ.

[29] Ex. 1 at 27, 31, 34-35, 40, 63.

[30] *Id*. at 63.

[31] Ex. 1 at 29.




24. On April 25, 2024, antisemitic and anti-Israeli students erected an encampment and occupied Royce Quad, one of the busiest and most important areas on UCLA's campus. The encampment was organized by UC Divest, a group of official student organizations including SJPatUCLA.[32]

25. The occupiers promptly fortified the encampment. They "built a barrier around it, fashioned with sheets of plywood, some of which were affixed to metal bicycle racks."[33]

26. The illegal encampment took up nearly the entirety of Royce Quad, making passage impracticable and often impossible for anyone the occupiers sought to exclude.[34]

[32] *Id.* at 50-51.

[33] *Id.* at 52.

[34] Image source: UCLA Alumni, *Campus Protests*, https://perma.cc/3DT5-9ZX6.



27. The occupiers barricaded the doors of Royce Hall and Powell Library with garbage cans, tents, ropes, and bicycle racks. They vandalized the buildings with spray-painted graffiti, including "FUCK ISRAEL."[35]




[35] Image source: David Ganezer, *UCLA's Royce Hall Left Covered in Filth and Graffiti, After Police Remove Pro-Hamas Protestors From Their Encampment*, Santa Monica Observer (May 6, 2024), https://perma.cc/GJU5-32N5.

28. Although the occupiers frequently claimed they were not antisemitic, their actions demonstrated otherwise. One building was defaced with graffiti reading, "FUCK ALL Jews."[36] One tent displayed a sign reading, "israelis Are Native 2 HELL."[37]







29. UCLA's official advice to students who needed to access Royce Quad and adjacent buildings was simply to "avoid the area if they wish."[38] On April 26, 2024, Vice Chancellor for UCLA Strategic Communications Mary Osako stated that UCLA had "taken several steps to help ensure people on campus know about the demonstration."[39]

30. Vice Chancellor Osako previously added that "UCLA's approach to the encampment is guided by several equally important principles," including "the need to support the free expression rights of our community."[40] In other words, UCLA viewed the encampment, despite its brazen violations of UCLA rules, as "free expression."

---

[36] Ex. 1 at 31.

[37] *Id*. at 39.

[38] UCLA Newsroom, *UCLA statement about encampment on campus* (April 26, 2024), https://perma.cc/JJQ2-TZC6.

[39] UCLA Newsroom, *UCLA statement on demonstrations*, (April 28, 2024) https://perma.cc/XB9P-X54L ("UCLA Statement on Demonstrations").

[40] *Id*.

31. UCLA took no meaningful steps to enforce its own rules or to help ensure people on campus could access academic buildings despite the "demonstration."[41] On the contrary, it accommodated the occupiers by turning off the sprinklers on Royce Quad.

32. A campuswide "Bruin Alert" described the encampment as "mostly peaceful."[42] An encampment that is "mostly peaceful" is still unacceptably violent.

33. In an April 28, 2024, statement, Vice Chancellor Osako claimed that UCLA was "heartbroken about the violence" at the encampment. She previously indicated that "University of California systemwide policy guidance … directs us not to request law enforcement involvement preemptively, and only if absolutely necessary to protect the physical safety of our campus community."[43] But notwithstanding its awareness of violence and its self-professed heartbreak, UCLA still did not request meaningful law enforcement involvement.

34. Vice Chancellor Osako further announced that UCLA "instituted additional security measures and increased the numbers of our safety team members on site."[44]

35. Despite the presence of UCLA's "safety team," on April 29, 2024, "the encampment protesters began using human phalanxes (with protesters shouting, 'human chain') to block certain persons from moving freely through public areas of Royce Quad[] and surrounded some other individuals to forcibly move them from areas in or adjacent to the encampment."[45]

36. Those "certain persons" were Jews, Israelis, and/or those that the protestors perceived to be Jews and Israelis.

---

[41] *Id.*

[42] Republican Staff Report, *Antisemitism on College Campuses Exposed*, House Committee on Education & the Workforce (Oct. 31, 2024) at 24, 26, https://tinyurl.com/472a7pt5/ ("Staff Report").

[43] *UCLA statement on demonstrations.*

[44] *Id.*

[45] Ex. 1 at 53.

37. According to media reports one Israeli student who attempted to traverse Royce Quad was met with screams of "Zionist!" and "Human chain!" The occupiers "linked arms and marched toward him … blocking him from accessing the heart of UCLA's campus."[46]

38. The occupiers' stated goal was to exclude perceived Zionists. One occupier, Agnes Lin, said in an interview with The Los Angeles Times that "[w]hat is not welcome is Zionism." Another occupier, Sabrina Ellis, admitted that the protestors' "top priority isn't freedom of movement." Ellis told The Los Angeles Times that students were not allowed to cross the encampment unless they agreed with the protestors' demands, which included boycotting Israeli universities.[47]

39. UCLA's Task Force concluded that the occupiers systemically and purposefully targeted Jews. For example, a Jewish student reportedly was told that he could not access a public walkway to Powell Library after "a male activist eyed his Star of David necklace."[48]

40. The occupiers handed out wristbands and "required passerby to wear a specific wristband to cross" the encampment. The "wristbands were given only to encampment participants, and people who supported the existence of the state of Israel were kept out."[49]

41. "By April 30, students wearing a Star of David or a kippah, or those refusing to denounce their Zionism (which for many Jews, but not all, is akin to renouncing their Jewish faith), were physically blocked by the protesters' phalanxes from entering or

[46] Jenny Jarvie, *'Are you a Zionist?' Checkpoints at UCLA encampment provoked fear, debate among Jews*, Los Angeles Times (May 9, 2024), https://perma.cc/R322-XM6N.

[47] *Id.*

[48] Jarvie, *'Are you a Zionist?'*

[49] Staff Report at 27 (quotation marks omitted).

passing through the occupied area of Royce Quad, entering Royce Hall, or entering Powell Library."[50]

42. The occupiers also "began to arm themselves with weapons, including pepper spray and lumber."[51] They established militia-style checkpoints on UCLA's campus and refused to allow Jews to traverse public property unless those Jews denounced a core tenet of their religion and Jewish or Israeli identity.

43. The occupiers largely succeeded in their goal of making the heart of campus *Judenrein*—or at least free of Jews who did not share their desire to annihilate Israel. In a case brought by Jewish students, *Frankel v. Regents of University of California*, this Court observed that "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith."[52]

44. Unsurprisingly, the armed antisemites decided to start assaulting Jews.

45. One Native American Jewish woman counterprotested by holding a sign reading "Hamas supporters are not welcome on native land." She was "quickly surrounded by a mob" and was "violently assaulted." UCLA police were "directly behind [her] and [did] absolutely nothing."[53]

46. Occupiers pepper-sprayed a Jewish woman wearing a Star of David and carrying an Israeli flag.[54]

---

[50] Ex. 1 at 53-54.

[51] *Id.* at 58.

[52] *Frankel*, 744 F. Supp. 3d at 1020.

[53] Tzvi Joffre, *Anti-Israel protesters at UCLA attack Native American woman opposing Hamas*, The Jerusalem Post (Apr. 28, 2024), https://perma.cc/94Z7-3YC3 (containing a video of the assault).

[54] *Jewish demonstrator pepper sprayed at UCLA protest*, FOX 11 Los Angeles, https://perma.cc/Q6KL-UFDU.

47. One Jewish student "was knocked to the ground and kicked by encampment participants. The student was initially unconscious with an open wound on her head, and she was taken to the hospital for treatment."[55]

48. Occupiers physically assaulted a Jewish man and told him, "Hitler missed one."[56]

49. Notwithstanding the occupiers' assaults on Jews and exclusion of Jews and Israelis, some UCLA faculty members "entered the encampment in support of its activities. By participating in the encampment activities including denial of campus access to Jews and those supporting Israel, those faculty participated in and abetted discrimination against and harassment of Jews and supporters of Israel."[57]

50. On April 30, 2024—a week after the occupiers erected the encampment—UCLA's administrators finally issued a statement that "declared the encampment illegal and directed all those involved to leave or face discipline."[58] Chancellor Block issued a statement on April 30 acknowledging that "Jewish students [were] in a state of anxiety and fear" and that "students on their way to class have been physically blocked from accessing parts of the campus."[59]

---

[55] Ex. 1 at 57-58.

[56] Ex. 2 at 3.

[57] Ex. 1 at 62.

[58] *Id.* at 59.

[59] Office of the Chancellor, *Affirming our Values in a Challenging Time*, (April 30, 2024), https://perma.cc/EZN2-8UWX.

51. At approximately 10:30 P.M. on April 30, counter-protestors "attacked the encampment[,] and violent skirmishes ensued."[60] According to the UCLA Faculty Association, these counter-protestors were "outside agitators" unaffiliated with UCLA.[61]

52. While UCLA's police stood idly by, the occupiers and counter-protestors attacked each other with pepper spray, blunt objects, and even fireworks.[62]

53. The resulting chaos transformed the heart of one of California's most prestigious universities into a war zone.[63]



[60] Ex. 1 at 59; Richard Winton, et. al, *A staggering two weeks at UCLA: Protest, violence, division mark 'dark chapter,'* Los Angeles Times (May 7, 2024), https://perma.cc/VZA9-JGT8.

[61] UCLA Faculty Association, *UCLA-FA Statement On The Anniversary Of The April 30 Attack On Our Students* (May 6, 2025), https://tinyurl.com/4cthf596.

[62] *Watch: Counter-protesters attack UCLA pro-Palestinian camp*, BBC (May 1, 2024), https://perma.cc/JNV9-4MA3.

[63] Image sources: Karla Rendon, *Photos: Pro-Israeli, pro-Palestinian demonstrators clash at UCLA*, NBC Los Angeles (Apr. 28, 2024).







54. Between 1:40 and 3:00 A.M. on May 1, 2025, police finally arrived and halted the violence.[64] California Governor Gavin Newsom called the belated police response "limited and delayed" and "unacceptable." Los Angeles Mayor Karen Bass called the violence "absolutely abhorrent and inexcusable."[65]

55. On or about May 1, "a van displaying the Star of David inside a Nazi swastika, along with antisemitic writing referring to Jews as 'puppet masters,' was parked on UCLA's campus in support of the encampment." According to one observer, the occupiers "did not challenge this van; many who passed it showed immense enthusiasm and approval for its presence."[66]

[64] Winton, et. al, *A staggering two weeks at UCLA*.

[65] Regan Morris and Sam Cabral, *UCLA Clashes: Police criticized for 'delayed' response to violence*, BBC (May 2, 2024), https://perma.cc/9NFD-TLA4.

[66] Ex. 1 at 65; Ahmed Fouad Alkhatib (@afalkhatib), X (May 2, 2024, 4:48 PM PDT), https://perma.cc/4E2C-H298.




56. For unknown reasons, police did not completely clear the encampment the morning of May 1. Later in the day, the self-anointed UCLA Palestine Solidarity Encampment, in an apparent effort to prepare to resist a law-enforcement operation, requested their patrons to provide riot gear such as airsoft goggles, helmets, knee and elbow pads, and flashlights with strobe settings. This group also requested food, but "NO bagels."[67] As UCLA's Task Force explained, "Banning foods associated with Jews demonstrates clear antisemitic sentiment and should not be interpreted as an act of boycotting a country, as bagels are mass produced by many companies worldwide. Bagels are strongly associated with Jewish culture and religion."[68] Bagels are often associated with both religious and non-religious ethnic Jews.

[67] Ex. 1 at 58.

[68] *Id.* at 58 n.136.

57. As police prepared to clear the encampment, UCLA canceled all on-campus classes.[69]

58. The morning of May 2, the Los Angeles Police Department, at last, cleared the encampment. Many occupiers resisted arrest and clashed with police officers, who were forced to use rubber bullets to protect themselves.[70]



[69] Staff Report at 29.

[70] Winton, et. al, *A staggering two weeks at UCLA*; image source: *In Pictures: Police storm UCLA protest encampment* (May 2, 2024), https://perma.cc/CX8R-XYZ8.



59. The encampment, along with other anti-Israel demonstrations in spring 2024, cost UCLA nearly $12.3 million, approximately half a million of which were spent cleaning up campus and repairing vandalized items and buildings.[71]

60. Few, if any, of the occupiers who blocked the heart of campus and terrorized Jews and Israelis faced any meaningful consequences from UCLA.

61. The belated disbanding of the encampment did not end antisemitism and anti-Israeli discrimination at UCLA.

62. On May 6, 2024, UCLA's police found a group of about 40 people inside Parking Structure 2 wearing masks and in possession of metal pipes, bolt cutters, epoxy adhesive, super glue, padlocks, heavy-duty chains, and documents "encouraging violence

[71] Gabirelle Gilette and Shiv Patel, *UCLA spends millions on pro-Palestine protests, considers attendants to fund costs*, Daily Bruin (July 29, 2024), https://perma.cc/77KV-KNYG.

and vandalism." UCPD believed these individuals planned to use their tools to break into, occupy, and vandalize Moore Hall. [72]

63. UCLA reportedly referred 245 arrests in connection with the encampment and May 6 incident to the Los Angeles City Attorney's Office. The City Attorney declined to file charges for every single referral from UCPD "for evidentiary reasons or due to [the U]niversity's failure or inability to assist in identification or other information needed for prosecution."[73]

64. On May 23, 2024, in testimony before Congress, when asked if UCLA had taken substantive steps to eliminate discrimination, Chancellor Block admitted that UCLA "need[s] to do more." He also acknowledged that the occupiers' "explicit glorification and endorsement of a U.S. designated terrorist group, which massacred 1,200 innocent Israel civilians on October 7" was "unacceptable."[74]

65. During the Chancellor's Capitol Hill testimony, protesters established a second encampment at the Kerckhoff Hall patio with barricades that disrupted campus operations. They then marched to Dodd Hall where some protesters locked themselves inside while others blocked access from the outside for about three hours. Members of UCLA's Jewish and/or Israeli community had to once again carefully plan their timing and routes to avoid being confronted by antisemites as they navigated campus.[75]

---

[72] UCLA Police Department News Release, *Statement Regarding the Incidents on Monday, May 6, 2024*, https://perma.cc/NME3-JF5R.

[73] Office of the City Attorney, LA City Attorney Hydee Feldstein Soto Announces Filing Decisions from 2024 UCLA/USC Mass Protests, (Apr. 25, 2025), https://perma.cc/R82Q-AUPY.

[74] Calling for Accountability: Stopping Antisemitic College Chaos, Hearing before the Comm. on Educ. and the Workforce, 118th Cong. (2024), https://perma.cc/7K54-YVCB.

[75] Hannah Fry, et. al, *Police descend on UCLA after protesters erect new pro-Palestinian encampment*, Los Angeles Times (May 23, 2024), https://perma.cc/8V7T-Z8UA; *Israel on Campus: State of Jewish Bruin Life in Light of the War in Israe*l, Hillel at UCLA (May 23, 2024), https://perma.cc/7SJ8-PJ4G.

66. On June 10, 2024, protesters made multiple attempts to set up encampments in various locations. According to UCLA, a group of people dyed the water in Shapiro Fountain red, used water-filled barriers and chicken wire to block the area, used amplified sound, and set up tents and canopies. The group then moved to the Kerckhoff Hall patio carrying wooden shields. There, the group proceeded to vandalize property with permanent red paint and erected barriers that blocked students and the public from accessing that part of campus. Simultaneously, another group at Moore Hall disrupted final exams. The Kerckhoff Hall patio group later moved to an area near Dodd Hall. They blocked students from entering classrooms, forcing them to miss finals. Additionally, some students had to be evacuated during their final exams. Throughout the evening, protestors also violently attacked safety personnel and law enforcement, resulting in at least six injuries to UCPD personnel and other safety officers. One security guard was left with his head bleeding after he was struck with an object.[76]

67. These acts of vandalism, violence, and intimidation—enabled by UCLA's ongoing deliberate indifference to discrimination against Jewish and Israeli students—violated UCLA's content-neutral time, place, and manner rules.[77]

**B. Survey Evidence Confirms that Jewish and Israeli Students Were Excluded from Participation in and Denied the Benefits of a UCLA Education Because of Their Race or National Origin.**

68. In June 2024, UCLA's Task Force surveyed 428 Jewish and Israeli students, faculty members, and staff at UCLA. All 428 respondents identified as Jewish, and 66 identified as Israeli. The survey asked respondents about their experiences with antisemitism and anti-Israeli bias at UCLA.[78]

---

[76] UCLA Newsroom, *Condemning Monday's violence on campus* (June 11, 2024), https://perma.cc/4H7L-UEMW.

[77] Office of the Administrative Vice Chancellor, *Reminder of UCLA's Time, Place and Manner Policies to all Bruins*, (Jan. 4, 2024), https://perma.cc/L29F-S5W9.

[78] Ex. 1 at 11, 17.

69. "Across all respondents, 67.1% (n=285) reported that antisemitism is a problem or a serious problem at UCLA and 74.9% (n=311) reported that anti-Israeli bias is a problem or serious problem at UCLA."[79] And "[o]f great concern to campus safety, nearly one fifth (n=74) of reporting respondents indicated that they had experienced a physical threat and 7.1% (n=28) of those responding reported experiencing a physical attack."[80] Roughly 50% of Jewish and Israeli students witnessed physical threats or attacks directed at Jews and Israelis.[81]

70. Some surveyed individuals blamed UCLA's inactions for rampant antisemitism and anti-Israel discrimination. One opined, "The lack of pushback from the professors, administration, deans, chancellor, allows this to get worse daily."[82] Another explained, "The situations could have been handled much better if UCLA took an active initiative to create a safe environment on campus by controlling protests rather than producing security for those spewing hate."[83]

71. Several survey respondents described experiencing or witnessing physical threats and assaults:

a. "I was approached and told by a protestor that she belongs to Hamas. A friend of mine was pepper sprayed by a protestor for her Jewish identity."[84]

b. "The only incident I saw personally was during the first few hours of the encampment, in which a pro-Palestinian girl (a history TA [teaching assistant], according to herself) walked up to the pro-Israeli counter

---

[79] *Id.* at 20.

[80] *Id.* at 32.

[81] *Id.* at 33.

[82] *Id.* at 24.

[83] *Id.* at 30.

[84] *Id.* at 35.

protestors and started shouting at them. A girl started recording the incident, which caused the TA to threaten her with violence if she continued. Because it was within her legal right and also for safety purposes, she continued. In return, the TA promptly slapped her several times and then tried to run away."[85]

c. "I was assaulted, threatened, and harassed during the encampment. I had an Israeli flag and a man ran towards me in order to push me. I was blocked for being Jewish. They were calling for an intifada collectively which is to kill the Jews."[86]

72. Perhaps most alarmingly, 59.6% of all respondents "reported spending less time on campus due to antisemitism and anti-Israeli bias," and 41.4% of all respondents "affirmatively stated that they had thought about leaving UCLA due to antisemitism or anti-Israeli bias."[87] This is, of course, precisely what the occupiers and other protestors intended.

73. UCLA's David Geffen School of Medicine contemporaneously witnessed a "dramatic decline in Jewish student enrollment from 20-30% of the student body to fewer than 10 students per class of 175."[88]

---

[85] *Id.*

[86] *Id.*

[87] *Id.* at 41-42.

[88] Letter from Jewish Faculty Resilience Group to UCLA Chancelor Julio Frenk, et. al (Feb. 9, 2025), available at https://perma.cc/B3ED-MDFQ. The Department of Justice has found that the David Geffen School of Medicine presently "intentionally discriminates against applicants based on their race." Department of Justice letter to Debo P. Adegbile, *Re: United States' May 9, 2025, Title VI Inquiry Findings* (May 9, 2025) 1, https://perma.cc/UX2C-A6CT.

74. Despite UCLA's acknowledgment that the encampments, unrest, and violence on its campus endangered Jewish students,[89] this hostile environment remains in place.

75. Jewish and Israeli students have reported avoiding UCLA's campus altogether unless absolutely necessary due to the unchecked hostile environment.

76. Since September 19, 2025, UCLA has relaxed its time, place, and manner policies. For example, amplified sound purportedly restricted to an 85-decibel threshold is no longer prohibited during marches, and prior approval for the use of amplified sound by campus administrators is no longer required.

77. At all relevant times, UCLA has maintained policies prohibiting individuals on campus from "[c]onceal[ing] one's identity or refus[ing] to provide identification for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of University or UCLA policies or applicable laws…"[90] Nonetheless, groups such as SJPatUCLA continue to instruct demonstrators to "[w]ear clothes that won't make you easily identifiable[,]" [d]o not respond to cops or give them any information[,]" and that "[m]asking is required and we will provide masks!"

78. The presence of masked individuals engaging in amplified antisemitic chants while blocking the paths of Jewish students and community members is intimidating and creates a heightened sense of fear and insecurity for those students and community members.

79. UCLA continues to take no meaningful action against these groups to enforce or prohibit policy violations.

80. As recently as October 7, 2026—during the third anniversary of Hamas' slaughter of Jewish civilians on Israel's soil—masked SJPatUCLA members marched and

[89] UCLA Initiative to Combat Antisemitism Action Group Report, p. 10, 7/29/2026 (https://perma.cc/W2JH-KAF5).

[90] UCLA Policy 850 § IV(A)(19); Interim UCLA Policy 850 § IV(A)(19).

demonstrated on UCLA's campus, shirking UCLA's disruption and sound amplification threshold rules with bullhorns chanting "There is only one solution, intifada revolution."[91] During this event, the demonstrators physically blocked Jewish students and community members from traversing campus common areas, further violating campus conduct codes.

**C. UCLA Had Actual Knowledge of the Harassment and Exclusion of Jewish and Israeli Students.**

81. UCLA knew that Jewish and Israeli students faced a hostile educational environment following Hamas's October 7 terrorist attack.

82. According to the Task Force Report, at least 129 Jews or Israelis at UCLA "made an informal or formal complaint."[92]

83. A small sample of complaints follows:

a. "On 04/30/2024, Complainant reported being barred from entering the area of Royce Hall and Royce Quad because she is Jewish. Non-Jewish students put up walls, physically barred them and others from access, and requested to see 'wristbands' near Royce Quad to pass.'"

b. "On 04/30/2024, Complainant reported that her child is unable to access classes or the library because protestors will not give him a wristband because they know him to be Jewish."

c. "On 05/02/2024, openly Jewish Complainant reported that they and their friend were walking to Lab when they heard a man shouting 'Kike' and 'fuck you kike' repeatedly. Respondent then attacked a Jewish family and chased them while screaming 'Fuck you Jews, hope you fucking rot in hell where you all belong.' Complainant informed security and alleges concerns were brushed off."

---

[91] https://perma.cc/2RJ9-A7X4.

[92] Ex. 1 at 36.

d. "On 05/02/2024, Complainant reported they were at the protest for Palestine and were standing and holding a sign peacefully. Two Respondents attempted to knock down the sign by swinging at Complainant with a flag. When they were unsuccessful, one of the Respondents … grabbed Complainant by the hair with enough force to break the hair clip Complainant was wearing and rip out some hair."

e. On 02/26/2025, Complainant reported her Jewish daughter feeling threatened by a guest instructor who was wearing a shirt with a UC Logo with the words "Intifada" and "strike for Gaza" in place of what should have been the date of incorporation for the university in addition to her professor wearing symbols used by terrorist groups to identify and kill Jewish targets.

f. On 06/05/2025, Complainant reported her daughter was menaced by a masked group of protesters on campus wearing keffiyehs and chanting "there is only one solution, Intifada revolution" and death to Chancellor Frenk.

84. UCLA knew that occupiers erected an enormous encampment in the heart of its campus. On April 26, 2024, UCLA's administrators sent a campuswide alert, stating that they were "monitoring" the "mostly peaceful" situation.[93]

85. That same day, a Jewish woman was beaten with a stick at the "mostly peaceful" encampment, prompting the Executive Director of the UCLA Hillel to email Chancellor Block and urge him to end the encampment."[94]

86. Even before occupiers began to physically exclude Jewish and Israeli students from academic buildings, UCLA leadership privately "recognized the

---

[93] Staff Report at 26.

[94] *Id.*

encampment as a threat to student and campus safety."[95] On or about April 27, 2024, campus police "requested a drone operator, at least 100 security contractors, and an LAPD mobile field force."[96]

87. On April 27, 2024, UCLA announced that it "deployed uniformed Student Affairs Mitigators" and "Public Safety Aides" to "engage in 'de-escalation.'"[97] Administrative Vice Chancellor Michael Beck "informed faculty that a large counter-protest was expected the next day."[98]

88. On April 29, 2024, campus police "discussed its urgent staffing issues."[99]

89. UCLA had actual knowledge that occupiers were preventing Jewish and Israeli students from accessing academic buildings. The occupiers did so "as uniformed Student Affairs Mitigators and Public Safety Aides stood idly by."[100]

**D. UCLA Was Deliberately Indifferent to the Harassment and Exclusion of Jewish and Israeli Students.**

90. UCLA's refusal to enforce its own viewpoint-neutral time, place, and manner rules governing the freedom of speech and assembly evinces its deliberate indifference to the suffering of its Jewish and Israeli students. These rules existed at all relevant times and were intended to ensure the orderly operation of campus.[101]

91. Some of UCLA's viewpoint-neutral rules in place during the 2023-2024 academic year provided that no one may:

---

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.* at 27.

[100] *Id.*

[101] *See*, *e.g.*, Office of the Administrative Vice Chancellor, *Reminder of UCLA's Time, Place and Manner Policies to all Bruins*, (Jan. 4, 2024) https://perma.cc/NTR3-5MUJ.

a. block entrances or interfere with the free flow of traffic into and out of campus buildings;
b. knowingly and willfully interfere with the peaceful conduct of the activities of the campus or any campus facility by intimidating, harassing, or obstructing any University employee, student, or any other person having lawful business with the University;
c. produce amplified or non-amplified sound that disrupts campus activities;
d. camp except in authorized locations;
e. engage in physically abusive, threatening, or intimidating conduct toward any person;
f. fail to comply with the directions of a University official acting in the performance of his or her duties;
g. refuse to identify themselves to the relevant University officials and present a BruinCard upon reasonable cause;
h. put signs, posters, paint, chalk, or ink messages on walls, windows, floors, or other surfaces of campus buildings or structures, streets, or walkways except as set forth in the applicable policies;
i. possess weapons that could cause bodily injury on campus except as authorized;
j. wear a mask or personal disguise or otherwise conceal their identity to intimidate others or escape identification while violating UCLA policies or the law; or
k. demonstrate without prior written approval from the UCLA Events Office.[102]

[102] *See generally* UCLA Regulations on Activities, Registered Campus Organizations, and Use of Properties (Sept. 25, 2017), https://perma.cc/T79C-XZPA.

92. UCLA's Student Conduct Code also requires students to comply with the directions of UCLA officials and public officials acting in the course of their duties on UCLA property and not to resist or obstruct UCLA or public officials when performing their duties.[103]

93. Although students and faculty have a right to peacefully protest, they may do so only in accordance with UCLA's lawful time, place, and manner restrictions. Despite the existence of longstanding viewpoint neutral time, place manner restrictions, UCLA's administrators allowed antisemitic and anti-Israel protests made up of students, employees, and non-affiliates to increasingly violate UCLA's rules with impunity, emboldening them to deface the campus and commit acts of violence. This culminated in a nearly week-long encampment and the de facto exclusion of Jews and Israelis from the heart of UCLA's campus. Indeed, UCLA's Task Force found that "throughout most of 2023-2024, campus leadership repeatedly decided not to enforce federal law, state law, and University and campus rules," "resulting in failure to protect the Constitutional rights of Jews on campus."[104]

94. UCLA allowed the encampment to persist for over a week, even though the encampment violated over a dozen rules.

95. As UCLA's Task Force Report explained,

> "From the outset, the encampment itself stood in violation of several University and campus rules. Tents were erected by affiliates and non-affiliates and remained on Royce Quad day and night, in violation of (1) UC Office of the President (UCOP) regulations prohibiting non-affiliates from setting up or maintaining any tent or camping overnight on University property; (2) UCOP Policies applying to Campus Activities, Organizations, and Students (PACAOS) prohibiting any use of University property by students or student organization in violation of time, place, and manner restrictions; (3) the UCLA Group Code of Conduct prohibitions on placement of temporary structures on campus, (4) unauthorized extracurricular use of

[103] Student Conduct Code: 102.16 Failure to Comply, UCLA Office of Student Conduct, https://perma.cc/3B5F-XAX3.

[104] Ex. 1 at 6, 45.

> University facilities, (5) unauthorized holding an 'interim major event not sponsored by a University unit;' (6) and several other UCLA regulations … (7) Attaching plywood to the bicycle racks violated UCOP regulations prohibiting the unauthorized erection of barriers and structures, (8) the UCLA Group Conduct Code prohibition on misuse of University property, (9) and other UCLA policies and procedures … (10) Painting, writing, or chalking graffiti on University property, violates California state law prohibiting vandalism, and the extent of damage that graffiti caused constituted felony vandalism; (11) violates the Student Conduct Code and University Group Conduct Code prohibitions of damage or destruction of University property; and (12) violates the UCLA Regulations on Activities, Registered Campus Organizations, and (13) Use of Properties' prohibition against paint, chalk, or ink messages affixed to surfaces of campus buildings or structures."[105]

96. Rather than enforce its rules against the occupiers, UCLA "simply 'monitor[ed]' as conditions deteriorated, and only act[ed] once the campus erupted into open violence. Members of the radical, antisemitic, and illegal encampment, whitewashed by UCLA's public statements as a demonstration 'for Palestinian rights,' escaped accountability for exclusion of Jewish students from campus. Even the students and affiliates arrested for acts of violence and resisting arrest avoided suspension or even probation."[106] Nearly all of the arrested students avoided criminal charges, in large part due to UCLA's "failure or inability to assist in identification or other information needed for prosecution."[107]

97. After the encampment was finally disbanded, UCLA continued to display shocking disregard for the rights of its Jewish students. In *Frankel*, UCLA maintained

[105] Ex. 1 at 51-53 (numbers added).

[106] Staff Report at 30.

[107] Office of the City Attorney, *LA City Attorney Hydee Feldstein Soto Announces Filing Decisions from 2024 UCLA/USC Mass Protests*, (Apr. 25, 2025), https://perma.cc/S5QZ-WSRP.

that it "has no responsibility to protect the religious freedom of its Jewish students because the exclusion was engineered by third-party protesters."[108]

98. UCLA thus continues to facilitate the harassment of Jewish and Israeli students on its campus by unidentifiable student and third-party demonstrators by choosing not to enforce existing policies that proscribe the concealment of identity.

99. On October 7, 2024, in an apparent celebration of the one-year anniversary of Hamas's terrorist attacks, SJPatUCLA "organized and held a demonstration in North Dixon Court, advertised by SJPatUCLA as requiring masks, in violation of campus time, place, and manner restrictions, and other campus and University rules."[109] UCLA took no corrective action.

100. In October 2024, the Republican Staff of the House of Representatives Committee on Education & the Workforce published a report ("Staff Report") finding that "UCLA allowed the creation of a hostile environment for Jewish students, in violation of Title VI."[110]

101. The Staff Report found that the violent clashes between occupiers and counter-protestors "was the direct result of UCLA's failure to hold rule-breaking students and their trespassing allies in the encampment accountable for days of civil rights violations and violence targeted at Jewish students and supporters of the existence of the state of Israel."[111]

102. The Staff Report agreed with UCLA's Task Force's finding that "the encampment was unlawful and in violation of UCLA policy from the second it was formed in the early hours of April 25, 2024." UCLA nonetheless "chose to ignore its own rules

---

[108] *Frankel*, 744 F. Supp. 3d at 1020.

[109] Ex. 1 at 71.

[110] Staff Report at 24 (emphasis omitted), *supra* n. 39.

[111] *Id.*

and 'monitor' the encampment, prioritizing 'de-escalation' rather than taking decisive action."[112]

103. The Staff Report provided additional details regarding UCLA's deliberate indifference toward the encampment and its discriminatory effects on Jewish and Israeli students. For example, UCLA ignored the advice of its own safety officials. When the encampment was first being constructed, a UCLA police officer suggested that campus police "attempt to identify the individuals and remove anyone who was not a member of the faculty, staff, or student body." The officer was instructed to "hold off."[113] The UCLA fire marshal warned administrators that the "wall of wooden pallets" surrounding the encampment and that blocking ingress and egress for Jewish and Israeli students was "unacceptable," but "no action was taken to disperse the encampment or prevent further fortification."[114]

104. In February 2025, UCLA finally issued an interim suspension of registered student organization status against SJPatUCLA and the UCLA Graduate SJP (GSJPatUCLA), even though these groups were responsible for much of the misconduct described above. The suspension came after people affiliated with the groups harassed Regent Jonathan Sures and members of his family outside his home, surrounded one of his family member's cars and prevented the family member from leaving, and vandalized Sures's home by applying red-colored handprints to the outer walls of his home and hanging banners on the property's hedges.[115] UCLA was deliberately indifferent to these groups' brazen defiance of its rules and discrimination against Jewish and Israeli students for over a year but took action only after the groups targeted a regent.

---

[112] *Id.*

[113] *Id.* at 25.

[114] *Id.*

[115] UCLA Office of the Chancellor, *A Stand Against Violence in our Community* (Feb. 12, 2025), https://perma.cc/NUF3-RTVF.

105. In March 2025, after the United States began investigating antisemitism and anti-Israeli bias in the University of California system, UCLA indefinitely revoked SJPatUCLA's registered student organization status and suspended GSJPatUCLA's status.[116]

106. Like UCLA's other rules, this ban existed only on paper, and no one took meaningful efforts to enforce it. According to social-media reports, SJPatUCLA held the following events after the ban went into effect:

a. On April 30, 2025, SJPatUCLA held an event to screen a documentary on the Royce Quad.[117]

b. On May 15, 2025, SJPatUCLA held a demonstration at Dickson Court North.[118]

c. On July 31, 2025, SJPatUCLA held a demonstration on the UCLA quad.[119]

d. On October 7, 2025, SJPatUCLA held another demonstration, where its members walked through campus while officials stood by and did not engage. Asked why the police were not enforcing the no masking rules,

---

[116] Jaweed Kaleem, *UCLA bans Students for Justice in Palestine as a campus organization*, Los Angeles Times (Mar. 28, 2025), https://perma.cc/8XR4-5J6R.

[117] Matthew (@melamedtattle), X (Apr. 28, 2025, 6:23 AM PDT), https://perma.cc/D7Q3-6AN8; *see also* Epistemology Quest (@EQuest38190), X (May 1, 2025, 10:40 AM PDT), https://perma.cc/R7LR-BTDS (reposting announcement for SJP event on April 30, 2025).

[118] Matthew Feinberg (@thewebbie), X (May 14, 2025, 5:01 PM PDT), https://perma.cc/RD7G-P26F; *see also* Eyal Yakoby (@EYakoby), X (May 15, 2025, 1:10 PM PDT), https://perma.cc/EPP2-AQUV.

[119] FAMOUSCENES3 (@LA84SUNRISE), X (July 31, 2025, 3:08 PM PDT), https://perma.cc/L4PY-L3ZP (video documenting demonstration).

a UCLA police officer responded that he was "not that high up on that totem pole" to make that determination.[120]

e. On January 20, 2026, SJPatUCLA held another demonstration outside of Murphy Hall and then proceeded to march and chant through the campus. No UCLA official or law-enforcement officer intervened despite the intimidating nature of the event.[121]

107. In addition to failing to enforce its own time, place, and manner rules, UCLA fails to enforce its anti-discrimination policy.

108. The 2024 University of California Anti-Discrimination Policy prohibited "conduct based on an individual's actual or perceived Protected Category … "that is sufficiently severe, persistent, or pervasive that it unreasonably interferes with, denies, or adversely limits an individual's participation in or benefit from the education, employment, or other programs or activities of the University, and creates an environment that a reasonable person would find to be intimidating or offensive." To determine whether conduct is harassment, the University considered, among other factors, "[w]hether the conduct was physically threatening" or "[w]hether the conduct would be objectively viewed as intimidating or offensive by a reasonable person."[122]

109. "Protected Categor[ies]" included any "identity protected by federal or state law, including the following: race, religion, color, citizenship, national or ethnic origin, [and] ancestry."[123]

---

[120] Jewish Faculty at UCLA (@JFrgatUCLA), X (Oct. 9, 2025, 8:00 AM PDT), https://perma.cc/79UD-3D9U; *see also* JFrgatUCLA, *2025 10 07 Noon Demonstration at UCLA By Masked "Suspended" SJP Group,* YouTube (Oct. 8, 2025), https://perma.cc/C44R-6JW7.

[121] Carolina Barsakov, *SJP protest outside of UCLA's Murphy Hall*, Daily Bruin (Jan. 20, 2026), https://perma.cc/QM9U-JCKG (including video documenting demonstration).

[122] University of California Anti-Discrimination Policy, 2 (Feb. 20, 2024), https://perma.cc/5ZTR-BQK5 ("Anti-Discrimination Policy").

[123] *Id.* at 4

110. By physically excluding Jews and Israelis from Royce Quad and adjacent buildings on the basis of their religion or national or ethnic origin, the occupiers of the encampment violated the Anti-Discrimination Policy. UCLA did not take adequate or timely measures to enforce the Policy.

111. Further, UCLA has a pattern or practice of ignoring or otherwise failing to investigate and effectively respond to complaints raised by Jewish and Israeli students, even though its Anti-Discrimination Policy pledges that UCLA "will respond promptly and equitably" to such complaints.[124]

112. Students believed that "campus offices responsible for enforcing such rules are indifferent or resistant to complaints related to antisemitism or anti-Israeli bias."[125]

113. UCLA's indifference toward complaints filed by Jewish and Israeli students chills the filing of meritorious complaints. One Jewish student who "was blocked by demonstrators from accessing Royce Quad … did not file a complaint with UCLA because a friend of theirs previously filed a similar complaint and no action was taken by the University."[126]

114. Another UCLA student filed a complaint with UCLA after UCLA staff ordered her to remove a mezuzah from her dormitory door for purportedly being a "fire hazard" in October 2024. Numerous other dormitory residents covered their doors in Halloween decorations and did not receive removal instructions from UCLA staff. She did not receive a response to her complaint until one year later, long after she graduated.

115. UCLA's practice of failing to respond to the complaints of its Jewish and Israeli students remains unchanged.

---

[124] *Id.* at 5.

[125] Ex. 1 at 75.

[126] Ex. 2 at 6.

**E. UCLA's Faculty and Staff Are Systemically Biased Against Israel and Israelis.**

116. In 2024, UCLA's EDI Office insisted that UCLA does "not tolerate acts of discrimination, harassment or conduct causing harm to individuals on the basis of race, color, ethnicity, gender, age, disability, religious beliefs, political preference, sexual orientation, gender identity, citizenship or national origin."[127] UCLA did, in fact, tolerate discrimination, harassment, and other harmful conduct against Jews and Israelis.

117. Even before Hamas's October 7, 2023, terrorist attack on Israel, many of UCLA's faculty and academic departments were hostile to Israel and Israelis. For example:

a. In May 2021, while Hamas was launching rockets into Israel, the Department of Asian American Studies issued an official statement, "lend[ing] our voices to uplifting the struggle of the Palestinian people." The Department proudly "salute[d] the 'Unity Uprising' as people across all parts of Palestine," including "historic Palestine [and] Jerusalem" (*i.e.*, Israel) "rise up together." The Department also blamed "the Israeli military's policing of the apartheid wall dividing Jerusalem and isolating the West Bank" for "the U.S.'s own brutal border security policies along the U.S.-Mexico border."[128]

b. In May 2021, the Center for the Study of Women and Department of Gender Studies signed a statement reading, "We stand in solidarity with the people of Palestine. We unequivocally answer and amplify the call

[127] UCLA EDI Office, *Inclusive Excellence Framework for Advancing EDI @ UCLA*, https://perma.cc/3HMJ-F5K6.

[128] UCLA Department of Asian American Studies, *Statement of Solidarity with Palestine* (May 21, 2021), https://perma.cc/2YK7-GBYD.

from the Palestinian Feminist Collective for 'feminists everywhere to speak up, organize, and join the struggle for Palestinian liberation.'"[129]

118. The faculty's anti-Israel bias intensified after Hamas's October 7, 2023, terrorist attack on Israel.

a. UCLA's Task Force received reports of "faculty teaching of content unrelated to a course, in violation of the APM [Academic Personnel Manual] prohibition on significant intrusion of material unrelated to a course and the Regents' Policy on Course Content, which prohibits … political indoctrination."[130] The quantity and contents of these reports are presently unknown to the United States.

b. According to UCLA's Task Force, 49% of Jewish and Israeli undergraduates "reported that teaching assistants engaged in behaviors that included offensive comments, verbal attacks, or discrimination."[131]

c. For example in, March 2024, a keffiyeh-clad guest speaker in the course Structural Racism and Health Equity—a mandatory course at the David Geffen School of Medicine—led the class in chanting "Free, Free Palestine" and prayed for "black" and "brown" people.[132] A UCLA staff member questioned one student who refused to participate, "which some students perceived as a form of discipline, singling them out while

---

[129] Gender Studies Departments in Solidarity With Palestinian Feminist Collective (May 24, 2021), https://tinyurl.com/jb8k7f2u.

[130] Ex. 1 at 61.

[131] *Id.* at 1-2, 33, 82.

[132] Aaron Sibarium, *UCLA Med School Requires Students To Attend Lecture Where Speaker Demands Prayer for 'Mama Earth,' Leads Chants of 'Free Palestine.'* Wash. Free Beacon (Apr. 2, 2024), https://perma.cc/XWR2-9MQW.

pressuring them to recite speech with which they disagreed or that violated their religious beliefs."[133]

119. Many UCLA departments, programs, and faculty affirmatively supported the illegal encampment and denounced UCLA's belated action to protect its Jewish and Israeli students. These statements evince overwhelming faculty hostility towards Israelis and apathy towards the suffering of Jewish and Israeli students.

a. The Center for the Study of Women announced, "[W]e stand with our students who bravely upheld their moral and ethical obligations to protest in solidarity with the people of Palestine and against ongoing genocide in the face of mob violence and an administration that has demonstrated its eagerness to use brutal police force against them. We demand full amnesty for those arrested or faced with disciplinary action … we join our students in denouncing Israel's ongoing campaign of genocide in Palestine."[134] The Center for the Study of Women did not condemn the "mob violence" faced by Jewish and Israeli students.

b. The Department of Art issued a statement decrying "the appalling violence that pro-Palestine student protestors experienced" and UCLA's belated decision "to call law enforcement in to forcibly destroy the encampment and arrest peaceful student protestors under the guise of campus safety. Students being shot with rubber bullets, trampled underfoot, and hit with police batons before being arrested is the opposite

---

[133] Ex. 1 at 61.

[134] UCLA Center for the Study of Women, *Center for the Study of Women Statement on Palestine Solidarity Encampment and Protests* (May 9, 2024), https://perma.cc/4WHY-XFAG.

of campus safety."[135] The Department of Art did not address whether the physical beatings of Jews is "the opposite of campus safety."

c. "The Black, Latinx, and Native American Faculty Collective of the David Geffen School of Medicine" described the encampment as a "peaceful Palestinian Solidarity Encampment" and complained that "the university police stood back, simply watched, filmed, and failed to stop the unrelenting violence" by "white supremacists." The Collective did not lament the "unrelating violence" that the occupiers inflicted on Jewish and Israeli students but instead demanded "[a]mnesty for all students and faculty arrested."[136]

d. Faculty in the Department of Design Media Arts admitted that they "participated in the peaceful, disciplined, and courageous protests" and declared that "[n]either our universities nor our taxes should be connected to perpetuating the brutal and unlawful military occupation imposed on the Palestinian people in Gaza and the West Bank. To stand up against this is something for which these students should be commended, not punished."[137] The professors did not address whether our universities or our taxes should fund the physical exclusion of Jews and Israelis from academic buildings.

---

[135] UCLA Department of Art, *Faculty Response to Violence on Our Campus*, https://perma.cc/ZX9Q-YK64.

[136] UCLA Black, Latinx, and Native American (BLNA) Faculty Collective of the David Geffen School of Medicine (DGSOM), *Statement from the [Collective] in Support of Students and Faculty and Broader Bruin Community Subject to Emotional and Physical Violence During the Past Week's Events*, https://perma.cc/X8M2-GD62.

[137] *Statement of undersigned members of the UCLA Department of Design Media Arts Faculty in response to the forcible removal of the Student Encampment* (May 4, 2024), https://perma.cc/X2TU-HYFK.

e. Faculty in the Mathematics Department denounced UCLA's "shameful … failure to protect our students" in the "protest encampment" from "an unprovoked mob attack." They called for a "transparent explanation" of UCLA's "coordination with the tactics of the militarized police forces."[138] They did not request a "transparent explanation" as to why UCLA tolerated a militarized antisemitic and anti-Israeli encampment.

f. Faculty in the Department of Architecture and Urban Design *affirmatively endorsed* how occupiers "check[ed] IDs to gain access" to areas they forcibly overran. The faculty praised the encampment as "an effective space where self-discipline was a collective, ongoing project which initially appeared to be supported and even praised by university administration." They announced that the occupiers had the right "to be kept safe."[139] They left unsaid whether that right extends to Jewish and Israeli students.

g. Faculty in Department of Anthropology labeled the encampment as "a model of its kind" and praised its "peaceful, orderly and self-disciplined environment." The faculty complained that then-peaceful counter-protestors "terrorize[d] the students" in the encampment by showing videos of Hamas's October 7 atrocities. They also accused UCLA of "turn[ing] on its own students" by clearing the encampment and blamed police for "refusing entry to Anthropology faculty trying to access our

[138] *Statement of the undersigned members of the UCLA Mathematics Department on the actions of the administration in response to recent student protests*, https://perma.cc/3TP7-PFQN.

[139] *Statement of the Undersigned Members of the UCLA Department of Architecture and Urban Design Faculty in Response to Recent Events on Our Campus* (May 4, 2024), https://perma.cc/74F2-9D74.

offices" in Haines Hall.[140] They made no mention of the Jewish and Israel students refused entry to buildings by armed occupiers, nor did they address how UCLA turned on its Jewish and Israeli students by failing to guarantee their physical safety.

h. Links to many additional, similar, statements are available at a website entitled *We Stand With Our Students / UCLA Faculty and Staff Speak Out*.[141] For unknown reasons, many of these statements appear to have been deleted, but according to a report by the Amcha Initiative, 33 academic units demanded amnesty for student protestors.[142]

120. Some faculty members "excused class attendance or assignments due to students or the faculty themselves participating in the encampment. There were also reports of courses offering extra credit for attendance at the encampment or related events," in violation of UCLA policy prohibiting faculty from interrupting "progress of an academic course … for purposes of political indoctrination or discussion of matters unrelated to course content."[143]

121. UCLA faculty preached anti-Israeli bias in courses having nothing to do with Israel and vociferously supported the antisemitic and anti-Israel encampment. The EDI Office—the very bureaucracy tasked with preventing discrimination—suffered from similar biases.

---

[140] *Statement of members of the UCLA Department of Anthropology Faculty in response to the forcible removal of the Student Encampment*, https://perma.cc/QC57-D9RU.

[141] *See* https://perma.cc/7WK6-7ZC3.

[142] Amcha Initiative, *When Faculty Take Sides: How Academic Infrastructure Drives Antisemitism at the University of California* (Feb. 2026) at 23, https://perma.cc/A3SL-TZ4Y.

[143] Ex. 1 at 62 (quotation marks omitted).

a. Former Vice Chancellor for Equity, Diversity, and Inclusion Anna Spain Bradley repeatedly has expressed outrage about Israel's military operations in Gaza while expressing no similar outrage about Hamas's attacks on innocent Israel civilians.[144]


Anna Spain Bradley reposted

UN Human Rights @UNHumanRights · Oct 29, 2024

We are appalled by deadly attack by Israeli forces on residential building in Beit Lahiya #Gaza. At least 25 children among those killed or missing.

Civilians & hospitals, ambulances & medics are protected from attack under IHL or any use for military purposes.

114 291 484 28 77.5K

b. In 2019, Vice Chancellor Bradley wrote a law-review article calling for racism to be "named … a violation of human rights under international law" and suggesting that those who "are not outraged by the prevalence of racism in today's world" have failed to "consider the depth of its harms."[145]

c. Vice Chancellor Bradley nevertheless failed to consider the depth of UCLA students' racism against Jews and Israelis. Although she condemned the counter-protestors who attacked the encampment and its occupiers, she offered no similar condemnation of the occupiers' attacks

[144] Anna Spain Bradley (@ASpainBradley), https://perma.cc/VA4F-RXL9.

[145] Anna Spain Bradley, *Human Rights Racism*, 32 Harv. Hum. Rts. J. 1, 7-8 (2019).

on Jews and Israelis. She also characterized the occupiers' conduct as "speech" and suggested that they were "stand[ing] against oppression."




d. The EDI Office's Civil Rights Office was at all relevant times led by Assistant Vice Chancellor for Civil Rights Chandra Bhatnagar, who was also UCLA's Local Implementation Officer for the UC Anti-Discrimination Policy. As the head of UCLA's impotent diversity bureaucracy, Bhatnagar was responsible for overseeing the handling and investigation of antisemitism complaints.

e. Bhatnagar has argued that "the United States is legally bound to fight racism."[146] Bhatnagar was legally bound by Title VI and UCLA's contracts with the United States to fight racism against Jewish and Israeli students at UCLA. He chose not to do so.

f. Bhatnagar's wife, UCLA law professor Sunita Patel, proudly participated in the encampment while wearing a mask, in violation of UCLA policy. She described the encampment as a "liberation zone."[147]

[146] Thalif Deen, Despite Western Boycott, Racism Meet Gets Overwhelming Support, Global Issues (Sept. 22, 2011), https://perma.cc/3XD4-95P7.

[147] Sunita Patel (@ProfSPatel), X (Apr. 28, 2024, 9:24 PM PDT), https://perma.cc/2VG9-6MY5.



Sunita Patel @ProfSPatel · Apr 29, 2024

More special signs spotted while @SJPatUCLA @lsjpucla liberation zone today. I was very proud of my restraint. Counter-protesters are so hard not to engage. One person suggested I was a coward for wearing a mask. "Show your face!"



g. At all relevant times, Jonathan Perkins was Director, Race and Equity in the EDI Office's Research and Bruin Engagement Office. Perkins believes that "white people possess very little actual, real-world knowledge about race issues, particularly about what it's like to be a member of a race this country deems abnormal and inferior."[148] He has posted on Bluesky that "white people are quite ignorant when it comes to race and racism" and that "it simply is not possible for a Black person to be racist toward a white person."[149] Many Jewish and Israeli students at UCLA are white or perceived as white.

h. Perkins also has claimed that "[n]o meaningful civil rights advancement has taken place in this country <u>without</u> riots."[150]

---

[148] Jonathan Perkins, *Choice: An Insidious Feature of Whiteness* (May 22, 2019), https://perma.cc/85F4-UNAT.

[149] JP (@johnathanperk.bsky.social), Bluesky (Mar. 1, 2026, 7:01 AM PST), https://perma.cc/G279-NEZR.

[150] Jonathan Perkins, *Don't Talk To Me About Looting: An Open Letter* (May 31, 2020), https://perma.cc/EAN7-DDR3 (emphasis in original).

i. Perkins took no meaningful action to prevent racism against his Jewish and Israeli charges.

122. UCLA's antisemitic and anti-Israeli biases extend to UCLA's employment practices. These illegal employment practices are the subject of another lawsuit brought by the United States, *United States v. Regents of the University of California*.[151] That complaint illuminates systemic antisemitism and anti-Israeli bias at UCLA. For example, it alleges UCLA's Undergraduate Students Association Council Cultural Affairs Commission discriminated against "Zionist" students because it equated Zionism to "antiBlackness" and other forms of "racism." The Commission included in its hiring policies the following language: "We reserve the right to remove any staff member who dispels antiBlackness, colorism, racism, white supremacy, zionism, xenophobia, homophobia, transphobia, sexism, misogyny, ableism, and any/all other hateful/bigoted ideologies." Alicia Verdugo, the former Commissioner of the CAC, informed her subordinates: "lots of zionists are applying – please do your research when you look at applicants and I will also share a doc of no hire list during retreat." This employment discrimination is ongoing. Jewish and Israeli employees have indicated that they remain afraid to come forward with complaints and harassment and discrimination and that they presently suffer adverse professional consequences because of antisemitism.[152]

123. Given the biases of UCLA's faculty and staff, many Jewish and Israeli community members believe that UCLA intentionally discriminates against them and accused UCLA of double standards. One stated, "If it were hate directed against any other minority group, there would be zero tolerance. It is becoming normalized at UCLA." Another individual noted, "Students and faculty at UCLA feel comfortable with antisemitic behavior (e.g. 'Are [you] Jewish/Israeli? Then you cannot be here') that, if it were directed to any other minority they'd be expelled (e g. "Are you black? Then you

[151] No. 2:26-cv-01946 (C.D. Cal.).

[152] *Id.*, Dkt. 1 at ¶¶ 84-85, 141-147.

cannot be here" or 'Are you gay?' Then you cannot be here"). Imagine what would have happened."[153]

124. Another explained, "People on campus are allowed to wear identity concealing masks and harass Jewish students and faculty with impunity while the campus community calls them 'peaceful' and comes to their defense. Meanwhile I know Jewish faculty who have been written up for microaggressions, as Jews are attacked for weaponizing antisemitism against free speech and racial equity simply for speaking out against civil rights violations. Insanity reigns."[154]

### F. This Court Held that UCLA Likely Violated the First Amendment by Permitting Occupiers to Exclude Jews from Campus.

125. In June 2024, a group of Jewish students sued Defendant, alleging that UCLA's willful tolerance of a "Jew Exclusion Zone" at the heart of campus violated state and federal law, including the First Amendment and Title VI.[155]

126. According to the complaint in that case (*Frankel*), the Jewish plaintiffs were "prevented from passing through the Jew Exclusion Zone." One was "repeatedly blocked from passing through the encampment to reach meetings and study sessions." Another was "shooed away by a security officer who" took the side of the occupiers and "chastised her and called her 'the problem' for attempting to peacefully observe the encampment." A third "was harassed and blocked from approaching the encampment by antisemitic activists, all with the assistance of UCLA security."[156]

127. This Court correctly held that Defendant likely violated the Free Exercise Clause of the First Amendment. Judge Scarsi rejected UCLA's argument that "it has no responsibility to protect the religious freedom of its Jewish students because the exclusion

---

[153] Ex. 1 at 24, 30

[154] *Id.* at 30.

[155] *See generally Frankel*, No. 2:24-cv-04702, Dkt. 1.

[156] *Id.* ¶ 16.

was engineered by third-party protesters"[157]—an argument that UCLA's Task Force found "had the effect of reinforcing a perception of its bias against Jews and/or supporters of Israel and seemed to discount the equal protection of Jews at UCLA." Indeed, because Jews and Israelis are disfavored minorities at UCLA, "[i]t is doubtful the University would make such an argument to rationalize discrimination against any other identity category protected by state or federal law."[158]

128. On July 29, 2025, Judge Scarsi entered a permanent injunction against Defendant. That injunction provides that Defendant is enjoined from: "offering any of UCLA's ordinarily available programs, activities, or campus areas to students, faculty, and/or staff if the Enjoined Parties know the ordinarily available programs, activities, or campus areas are not fully and equally accessible to Jewish students, faculty, and/or staff." Defendant also is "prohibited from knowingly allowing or facilitating the exclusion of Jewish students, faculty, and/or staff from ordinarily available portions of UCLA's programs, activities, and/or campus areas, whether as a result of a de-escalation strategy or otherwise."[159]

129. The requested injunctive relief in this suit differs from and exceeds the relief in *Frankel*.

**G. The United States Investigates UCLA.**

130. UCLA is the recipient of many grants from the federal government. Since October 7, 2023, UCLA has received more than $2.5 million from the Department of Justice alone.

131. These grants are legally binding contracts between UCLA and the United States. They include conditions requiring that UCLA comply with Title VI and its implementing regulations.

---

[157] *Frankel*, 744 F. Supp. 3d at 1020.

[158] Ex. 1 at 67.

[159] *Frankel*, Dkt. 210 at 2-3.

132. As a material condition of its receipt of federal financial assistance, UCLA signed a contract (Ex. 3) requiring that all its programs and activities would be conducted in compliance with all requirements of Title VI and its implementing regulations.[160] *See* 28 C.F.R. § 42.105. Condition 12 of the contract specifically contained assurances providing that UCLA, as the direct recipient, would "comply with all applicable requirements of 28 C.F.R. Part 42."[161] Part 42 provides that "[n]o person in the United States shall, on the ground of race … or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this subpart applies." 28 C.F.R. § 42.104(a).

133. UCLA periodically signed certificates of its purported compliance with Title VI. One such certificate was signed on October 17, 2024.[162]

134. On May 9, 2025, the Department of Justice began investigating UCLA's compliance with Title VI.

135. On July 29, 2025, the Department of Justice issued findings that UCLA is in violation of Title VI.[163]

136. The Department of Justice made two key factual findings. First, "Jewish and Israeli students at UCLA were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment. Jewish and Israeli students were assaulted, verbally harassed, and physically prevented from accessing parts of UCLA's campus on the basis of their actual or perceived race, religion, and/or national origin."[164] Second, "UCLA had actual notice that Jewish and Israeli

---

[160] Office of Justice Programs, *UCLA Youth Justice Navigator Initiative Agreement* (Oct. 17, 2024) (Ex. 3).

[161] *Id.* at 8.

[162] *Id.*

[163] *See* Ex. 2.

[164] *Id.* at 7.

students were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of the encampment. UCLA received at least **eleven** complaints alleging that demonstrators were discriminating against students on the basis of their race, religion and/or national origin during the time the encampment sat on Royce Quad."[165] These complaints included reports that Jewish students were "prevented … from accessing parts of the campus," "unable to access the library because demonstrators would not give them a wristband," "surrounded and detained … and prevented … from accessing Royce Quad," and physically assaulted.[166]

137. The Department of Justice accordingly concluded that "UCLA was deliberately indifferent to the hostile environment for Jewish and Israeli students caused by the encampment."[167] The Department of Justice negotiated with UCLA in good faith to attempt to bring UCLA into voluntary compliance with Title VI. The Department of Justice, along with other federal agencies, attempted to negotiate resolution of UCLA's Title VI violations. The Department of Justice has determined that UCLA will not voluntarily comply with Title VI.

138. UCLA's noncompliance with Title VI remains ongoing.

139. When the Department of Justice issued its findings letter in July 2025, UCLA had a practice of failing to enforce its time, place, and manner rules and of ignoring or refusing to take meaningful action to remedy discrimination complaints raised by Jewish and Israeli students. UCLA has yet to implement policies requiring its Civil Rights Office and other UCLA employees to promptly address and adequately resolve complaints of discrimination against Jews and Israelis. Nor has UCLA amended its policies to guarantee fair and robust enforcement of its time, place, and manner rules. Rather, UCLA has relaxed its time, place, and manner rules to the detriment of its Jewish and Israeli students.

---

[165] *Id.* at 7.

[166] *Id.* at 5,7.

[167] *Id.* at 8.

Indeed, UCLA's policy of non-enforcement or delayed enforcement of its time, place, manner, and conduct codes in response to illicit activities that harass its Jewish and Israeli student population remains in place.

140. Notwithstanding the Department of Justice's findings letter, UCLA still ignores complaints about antisemitic and anti-Israeli harassment and still refuses to enforce its time, place, manner, and campus conduct codes.

141. While UCLA brags about "indefinitely" revoking SJPatUCLA's Registered Campus Organization status, this action has had no meaningful impact on SJPatUCLA's ongoing campus operations that continue to menace UCLA's Jewish and Israeli students.

142. For example, on October 7, 2025, dozens masked members of SJPatUCLA called for an "intifada revolution." Their conduct violated UCLA's prohibition on wearing masks to conceal one's identity with the intent of intimidating a person or group. The Jewish Faculty Resilience Group previously had warned Chancellor Julio Frenk that SJPatUCLA "publicly called for a pro-Hamas rally and told all participants to wear masks" and asked him "to direct university officials to enforce all regulations ***precisely*** to avoid the type of situation that eventually unfolded." However, Vice Chancellor for Campus Safety Steve Lurie, who was present at the demonstration, refused to enforce UCLA's content-neutral mask ban.[168]

143. On May 16, 2026, SJPatUCLA organized an event starting at Murphy Sculpture Garden, where masked demonstrators marched through campus, used bullhorns to engage in antisemitic chants, blocked pedestrian walkways, and formed a human chain to block the path of a student perceived to be Jewish or Israeli, all in violation of UCLA's TPM and conduct codes.[169] The demonstration lasted nearly an hour without intervention from UCLA officials observing from a distance.

---

[168] Letter from Jewish Faculty Resilience Group to Chancellor Julio Frenk (Oct. 10, 2025), available at Jewish Faculty Resilience Group, *JFRG Advocacy: Countering Antisemitism at UCLA's Main Campus*, https://perma.cc/3MP9-8AW6.

[169] https://perma.cc/7Y54-KVYP.

144. On June 5, 2026, SJPatUCLA organized a march to Murphy Hall, where masked demonstrators engaged in antisemitic chants through bullhorns and obstructed roadways in violation of UCLA policies.[170] UCLA officials observing from a distance chose not to intervene.

145. On October 6, 2026, SJPatUCLA erected a screen and held a "Vigil for Martyrs" at Dickson Court South for the purpose of engaging in so-called "honorable hatred" where a Jewish student observer was followed by a demonstrator.[171] UCLA officials observing from a distance chose not to intervene.

146. On October 7, 2026, the third anniversary of Hamas's terrorist attack, SJPatUCLA held a demonstration and march through campus where masked demonstrators used bullhorns to engage in menacing antisemitic chants and formed human chains to block the ingress and egress of Jewish and Israeli students in violation of UCLA's time, place, manner, and conduct codes.[172] UCLA officials observing from a distance chose not to intervene.

147. Despite maintaining policies, such as UCLA Policy 110,[173] which purportedly limit the use of UCLA's name to Registered Campus Organizations and restrict uses of UCLA's name on social media, SJPatUCLA continues to use UCLA's name across social media platforms such as Instagram to advertise and broadcast its antisemitic demonstrations on UCLA's campus.

148. Despite purportedly revoking SJPatUCLA's Registered Campus Organization status, UCLA has made no effort to restrict SJPatUCLA's use of UCLA's name and likeness in connection with its ongoing antisemitic direct actions.

---

[170] https://perma.cc/D3QL-6SL.

[171] https://perma.cc/4P88-ACVZ.

[172] https://perma.cc/2RJ9-A7X4.

[173] https://perma.cc/763T-X8ZY.

## CLAIMS FOR RELIEF

## COUNT I

## (Title VI)

149. The United States realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

150. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[174]

151. Title VI prohibits discrimination against, or harassment of, Jews, especially when based on actual or perceived Israeli national origin.

152. Under Title VI's implementing regulations, a judicial enforcement action brought by the United States Department of Justice against a federal funding recipient that maintains a pattern and practice of non-enforcement and/or delayed enforcement of its policies and conduct codes with respect to unlawful discrimination against Jewish and Israeli students is an appropriate method for obtaining that recipient's compliance with Title VI.[175]

153. Title VI expressly permits the United States to effect compliance with Title VI through "…any other means authorized by law[.]"[176]

154. Indeed, "[n]othing in [the Civil Rights of Act of 1964] shall be construed to deny, impair, or otherwise affect any right or authority of the Attorney General or of the United States … under existing law to institute … any action or proceeding."[177]

---

[174] 42 U.S.C. § 2000d.

[175] 28 C.F.R. § 50.3.

[176] 42 U.S.C. § 2000d-1.

[177] 42 U.S.C. § 2000h-3.

155. No provision within Title VI or its implementing regulations requires that the United States plead or establish "deliberate indifference" in order to obtain a non-monetary judicial remedy for a Title VI violation manifested by a federally funded institution's intentional policy of enabling a hostile environment menacing a protected group, like Jewish and Israeli students, on its campus.[178]

156. After investigating UCLA's handling of unlawful antisemitic conduct on its campus, issuing findings that UCLA's botched handling of antisemitism violated its obligations under Title VI, meeting and conferring with UCLA in an effort to obtain voluntary compliance with its Title VI obligations, and determining that UCLA is unwilling to comply voluntarily, the Department brings this action to secure UCLA's compliance with its Title VI obligations.

157. Moreover, UCLA continues to foster an antisemitic hostile environment on its campus.

158. As set forth above, UCLA's official pattern and practice of not enforcing its rules and/or delaying enforcement of its rules in response to antisemitic conduct that subjects its Jewish and Israeli students to a hostile environment on account of those students' actual or perceived, race, color, or national origin remains in place.

159. UCLA has full knowledge of the severe and pervasive antisemitic hostile environment that its official policy of non-enforcement of its time, place, manner, and conduct codes is promoting to the detriment of its Jewish and Israeli students, rendering UCLA's purported actions taken to-date clearly insufficient to protect its Jewish and Israeli students and to comply with its Title VI obligations.

---

[178] *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288-292 (1998); *United States v. Marion Cty. Sch. Dist.*, 625 F.2d 607, 611-13 (5th Cir. 1980), *cert. denied*, 451 U.S. 910 (1981).

**<u>COUNT II</u>**

**(Title VI)**

160. The United States realleges and incorporates by references the allegations set forth in the foregoing paragraphs.

161. Title VI of the Civil Rights Act of 1964 provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

162. Title VI prohibits discrimination based on national origin, including discrimination against Israelis or those perceived to be Israelis because of their actual or perceived national origin.

163. Title VI prohibits discrimination based on race, including discrimination against Jews or those perceived to be Jewish because of their ancestry.

164. Title VI prohibits discrimination that arises from a recipient of federal funding's deliberate indifference to a discriminatory hostile educational environment.

165. Jewish and Israeli students at UCLA have been subjected to severe, pervasive, and objectively offensive harassment and discrimination from October 7, 2023, through the present on account of their actual or perceived race or national origin.

166. This severe, pervasive, and objectively offensive harassment and discrimination effectively denies Jewish and Israeli students at UCLA equal access to the education institution's benefits, resources, and opportunities.

167. UCLA discriminates against Jewish and Israeli students via its deliberate indifference to the repeated and widespread hostile actions of campus agitators against Jewish and Israeli students. UCLA creates a culture where antisemitism and anti-Israeli bias thrives. UCLA is aware of the harassment and discrimination that occurs in its programs and activities, yet it deliberately refuses to take action, or else, takes actions clearly insufficient in light of the known circumstances.

## COUNT III

**(Breach of Contract)**

168. The United States realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

169. At all times alleged in this Complaint, UCLA has received grants of federal funds from the United States, including from the Department of Justice.[179] These grants are legally binding contracts that require UCLA to comply with Title VI throughout the duration of the grants.

170. UCLA has breached the material terms of the grants by failing to comply with Title VI.

171. The United States has fulfilled all obligations owing to date under the grants.

172. Compliance with Title VI is a material term of the grants.

173. UCLA's failure to comply with Title VI is grounds for the United States to rescind the contracts and/or receive damages for grant payments made during the period of noncompliance.

**PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests this Court:

174. Declare that UCLA unlawfully discriminates against Jewish and Israeli students at UCLA in violation of Title VI via its pattern and practice of non-enforcement and/or delayed enforcement of its policies and conduct codes with respect to harassment of its Jewish and Israeli students and/or via its deliberate indifference to discriminatory harassment of Jewish and Israeli students and tolerance of a hostile educational environment since October 7, 2023, up to the present day;

175. Permanently enjoin UCLA, its officers, agents, employees, successors, assigns, and all persons in active concert or participation with them from unlawful

[179] See Ex. 3.

discrimination against and harassment of Jewish and Israeli students, including through deliberate indifference to known hostile environments;

176. Order UCLA to take affirmative steps to ensure full and equal access to UCLA's educational opportunities and benefits for Jewish and Israeli students, including, but not limited to:

a. Enforce existing content-neutral time, place, and manner restrictions for discriminatory protests and activities that interfere with Jewish and Israeli students' access to educational opportunities;
b. Enforce the existing University of California Anti-Discrimination Policy and related anti-bias policies against students, faculty, and staff who harass or discriminate against Jewish and Israeli students;
c. Impose timely and meaningful disciplinary consequences on students and faculty who harass or discriminate against Jewish and Israeli students in violation these policies;
d. Impose policies that require UCLA to seek help from and cooperate with law enforcement in arresting protestors who unlawfully impede movement through campus and occupy UCLA buildings and outdoor spaces following orders to disperse;
e. Impose policies that require UCLA to promptly and meaningfully investigate and resolve complaints of antisemitism and anti-Israeli bias;
f. Declare that Defendant is in material breach of its contracts and assurances of compliance under Title VI;
g. Declare that, as a result of Defendant's material breach of contract, the United States need not make any additional payments to UCLA otherwise required by existing grants;
h. Award to the United States damages for all grant payments made to UCLA during the time of UCLA's noncompliance with Title VI; or in the

alternative, rescind the contracts and order restitution of the same payments;

i. Enjoin Defendant, its officers, agents, employees, successors, assigns, and all persons in active concert or participation with them from entering into federal contracts containing assurances of compliance with Title VI until such time that the Court concludes UCLA is complying with Title VI;

j. Appoint an independent outside monitor, subject to approval and in collaboration with the United States, to oversee and ensure UCLA's full compliance with all injunctive and equitable relief ordered by the Court. The monitor shall be empowered to audit UCLA, make report to the United States and the Court, and recommend corrective actions for such duration and scope as the Court deems just and necessary;

k. Award such other additional relief as justice may require, including but not limited to fees and taxable costs, to the maximum extent permitted by applicable law.

Date: October 21, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

/s/ Julie A. Hamill
JULIE A. HAMILL
AARON KOLLITZ
Assistant United States Attorney
300 North Los Angeles Street
Suite 7516
Los Angeles, CA 90012
(213) 894-2464
julie.hamill@usdoj.gov
United States Attorney's Office for the
Central District of California

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JEFFREY G. MORRISON
Deputy Assistant Attorney General
Civil Rights Division

JOHN MERTENS
Acting Chief, Educational Opportunities Section
Civil Rights Division

/s/ Daniel S. Flickinger
DANIEL S. FLICKINGER
Senior Counsel
JOSHUA R. ZUCKERMAN
Attorney
Civil Rights Division
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 702-8186
daniel.flickinger@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*